GALVESTON, BRAZOS, AND COLORADO NARROW-GAUGE RAILWAY
COMPANY v. J. J. GROSS, COMMISSIONER OF THE GENERAL
LAND OFFICE.

1. MANDAMUS.—The District Court has no jurisdiction, by writ of *man-
damus* or otherwise, to control the action of the Commissioner of
the General Land Office in the issuance of railroad certificates.

2. Bledsoe *v.* International R. R. Co., 40 Tex., 537, affirmed.

3. COMMISSIONER OF LAND OFFICE.—In the issuance of certificates to
railroads, the Commissioner of the General Land Office is as much
beyond judicial control as the Comptroller in the issuance of
bonds, or the Governor in the discharge of any of his official duties.

4. LAND—RAILROADS.—It has been the policy of the State to reserve
alternate sections, in making donations of land to railroads, from
the act of January 30, 1854, (Paschal's Dig., art. 4955,) until the
Constitution of 1869 went into effect, prohibiting land grants to
railroads.

5. STATUTE CONSTRUED.—The act approved March 18, 1873, "to set
apart one half of the public domain for the support and mainte-
nance of public schools," was evidently passed in anticipation of the
adoption of the amendment to the Constitution allowing land dona-
tions to railroads, and it was competent in the Legislature to so
enact; it is therefore constitutional.

6. RULES OF CONSTRUCTION.—See discussion of rules for construction
of statutes.

7. SAME.—When the language of a legislative act is susceptible of two
constructions, one in accordance with and the other in violation of
the Constitution, it is presumed that the Legislature intended to
use the language in the sense consistent with the Constitution.

8. SAME.—There is no rule forbidding legislation looking to the contin-
gency of a constitutional change, at least when the consummation of
that change rests with the Legislature alone.

9. SAME—LANDS SET APART TO PUBLIC SCHOOLS.—The act of 18th
March, 1873, is beyond question constitutional in its main object, in
setting apart one half the public domain to the support of public
schools; and should that part of it touching "lands hereafter
granted" be disregarded, the part remaining is complete in itself,
and operates on all certificates thereafter issued, and continues the
system of alternate surveys, and setting apart to the purposes of the
act such even sections.

10. SAME—SCHOOL LANDS.—The general law providing for the alter-
nate sections applies to future donations of public lands, unless in
such grant it be expressly negatived.

11. SAME.—The act granting the appellant sixteen sections of land per mile of completed road, is governed, as to the kind of certificates to be issued, by the general law, and the railroad company is not entitled to certificates under its land grant otherwise than on the alternate-section plan.

[Associate Justice MOORE dissenting.]

APPEAL from Travis. Tried below before the Hon. E. B. Turner.

The facts are stated in the opinion.

*Flournoy & Scott,* and *Willie & Cleveland,* and *Ballinger, Jack & Mott,* for appellant.

*H. H. Boone, Attorney General,* for the State.

GOULD, ASSOCIATE JUSTICE.—The Galveston, Brazos, and Colorado Narrow-Gauge R. W. Co. was, on February 2, 1875, incorporated by special act, the fifth and sixth sections of which are as follows:

"SEC. 5. The State of Texas hereby donates and grants to the said company, out of any unappropriated public land of the State, sixteen sections of land, of six hundred and forty acres each, for each and every mile of railroad constructed and put in substantial running order by them; and whenever any section of five miles of said road has been completed, the said company, through its president and secretary, may give notice of the same to the Governor of this State, in writing, whose duty it shall be, on receipt of such notice, to order the State engineer, if there be any, or if there be none, then to appoint a skillful engineer to examine said section of said road, and to report under oath; and if said section of five miles of said road be found to be constructed and in running order, in a substantial manner, then the Governor shall certify the same to the Commissioner of the General Land Office, and he shall issue to said company sixteen land certificates, of six hundred and forty acres each, for each and every mile of road so constructed and put in running

order, and in like manner with each and every succeeding five miles of said road until the whole has been completed. And said company shall alienate their said lands acquired under the provisions of this act, except so much as may be necessary for the uses and successful operation of their said road, as follows: one fourth in eight years, one fourth in twelve years, one fourth in sixteen years, and one fourth in twenty years from the passage of this charter; and on failure to comply with the provisions of this section, said company shall forfeit all benefits under this charter: *Provided,* That the State shall in no case be liable for a deficiency of public domain, and no land certificate issued under the provisions of this act, which may not be located because of the previous exhaustion of the public domain, shall ever constitute any claim against the State.

"Sec. 6. Said company shall be subject to all general laws now in force, or that may hereafter be enacted in this State, regulating railroads and railroad companies, both as to the rates of freight and passage, as well as to the conduct of its officers and employees. Said company shall be liable to all restrictions imposed by any general railroad law of this State, and shall be entitled to any of the benefits conferred by the same."

In 1876, having obtained the Governor's certificate showing that a section of five miles of said road was "found to be constructed and in running order in a substantial manner," the company applied to the Commissioner of the General Land Office for eighty land certificates of six hundred and forty acres each, such as might be located and surveyed in single sections, in like manner as head-right certificates.

The commissioner, acting under the advice of the Attorney General, declined to issue any other than alternate certificates, conditioned so as to require under each certificate the location and survey of two tracts of 640 acres each, one for the railway company, and the other for the public-school fund, and this suit was brought to obtain a writ of *mandamus*

compelling the commissioner to issue certificates unincumbered with such conditions. The court below overruled exceptions denying its jurisdiction to control the action of the commissioner in the issuance of the land certificates. A jury being waived and the cause submitted to the court, the court held that the plaintiff was only entitled to alternate certificates; and from the judgment rendered in accordance with that opinion, the railway company has appealed.

Our opinion is, that the District Court had no jurisdiction, by writ of *mandamus* or otherwise, to control the action of the Commissioner of the General Land Office in the issuance of the certificates.

In the case of Bledsoe *v.* International R. R. Co., (40 Tex., 537,) it was held that the courts have no power to compel the chief officers of any of the executive departments of the Government to perform an official duty. We do not regard that case as having been overruled in the subsequent case of Kuechler *v.* Wright. Whilst the opinion expressed in the latter case developed the fact that a majority of the regular members of the court as then organized were prepared to hold that the District Courts had such jurisdiction, there was no decision to that effect. The principle decided in the case of Bledsoe *v.* International R. R. Co. is accepted by this court as the law. In the brief opinion delivered by the writer in Kuechler *v.* Wright, indorsing this principle, he stated that former decisions had recognized the authority of the courts to enforce the issuance of a patent by the Commissioner of the General Land Office through the writ of *mandamus*, and expressed a doubt as to the propriety of overruling those decisions.

On the principle of "*stare decisis*," of leaving undisturbed a long-settled judicial usage, recognized by a long train of decisions, originating, it is true, at a time when the Commissioner of the General Land Office was not recognized by the Constitution as one of the heads of departments, but was "regarded and treated by the courts as merely a ministerial

officer," but followed up after the change of the Constitution, the writer has been disposed to treat the issuance of a patent by the Commissioner of the General Land Office as an established exception to the general rule. But if this exception be admitted, it is to be limited to the case stated, and not to be extended to cases like the present. In the issuance of certificates to railroads, the Commissioner of the General Land Office is as much beyond judicial control as the comptroller in the issuance of bonds, or the Governor in the discharge of any of his official duties.

For this reason the judgment refusing the writ of *mandamus* must be affirmed. The court below refused the relief asked for, on the ground that under the law the railroad company was only entitled to alternate certificates. As we concur in this view of the law, a view which would also lead to an affirmance of the judgment rendered, it has been deemed proper, in response to one of the issues in the case, and to the request of the commissioner, assented to by the Attorney General, to state our opinion on this branch of the case, and some of the grounds on which it is based, without intending thereby to control the action of either of those officers.

The system of requiring lands donated to railroads to be surveyed in numbered sections, and of reserving the alternate or even sections for the State, was adopted by the act of January 30, 1854, and the reservation was extended to lands surveyed by virtue of that act, "or of any other act of the Legislature donating lands to any railroad company * * * until otherwise provided by law." (Paschal's Dig., art. 4955.) The statutes of the State, the decisions of the courts, and the Constitution of 1866 all show that this system continued in force until the Constitution of 1869–70 went into operation. (Paschal's Digest, arts. 4423, *et seq.*, 4947, 7358, *et seq.;* Tabor *v.* Com. G. L. O., 29 Tex., 508; Railroad Co. *v.* Commissioner, 36 Tex., 382; Const. of 1866, art. 10, sec. 3; Paschal's Dig., p. 944.) Sec. 6, art. 10 of the Constitution of 1869–70, which says: "The Legislature shall not hereafter

grant any land to any person or persons," * * * was construed as forbidding any more grants of lands to railroads, but not as affecting their rights under charters already granted, nor as preventing the operation of the system of alternate sections on certificates issued, or to be issued, under those charters.   The sections reserved to the State had now, under the operation of the Constitutions of 1866 and 1869, become a part of the school fund.   In 1871, the Legislature submitted to a vote of the people an amendment of section 6, art. 10, so as to allow of land grants for purposes of internal improvements.   In November, 1872, the people voted in favor of the amendment; and on the 19th of March, 1873, it was ratified by the Legislature, and became a part of the Constitution.   Just one day previous, to wit, on March 18, 1873, " An act to set apart one half of the public domain for the support and maintenance of public schools " was approved, and, if valid, took effect as follows:

" SEC. 1. *Be it enacted by the Legislature of the State of Texas,* That one half of the public domain of the State of Texas, or so much thereof as can be, is set apart and appropriated for the support and maintenance of public schools of this State, in the following manner, to wit: that all land certificates heretofore issued to any railroad company, or any other corporation of any nature whatever, for internal improvements, or for any other object, or any lands hereafter granted in any manner to any of said corporations or companies for any such object, shall be located and surveyed in alternate sections of six hundred and forty (640) acres each, and as directed by an act entitled ' An act to encourage the construction of railroads in Texas by donation of lands,' approved January 30, 1854, and other laws amendatory of or supplementary thereto; and the even numbers of sections and fractional sections thus located and surveyed, shall be, so soon as surveyed and designated in the manner prescribed by said laws, held and considered for all purposes to be set apart and appropriated for the support and maintenance of

public schools of this State, and shall constitute a part of the public-school fund; and that the alternate sections and fractional sections reserved, set apart, and appropriated, as aforesaid, shall not be subject to location, settlement, or survey of any homestead, pre-emption, or other claim whatever: *Provided*, That owners of valid head-right certificates, bounty land warrants, or other valid claims, shall not be required to locate and survey them in alternate sections as here prescribed, but in all cases they shall respect and not interfere with the alternate sections of land set apart as aforesaid.

"Sec. 2. That this act take effect and be in force from and after its passage." Approved March 18, 1873.

It is admitted by counsel who appear in this court, that "if this act be constitutional in all respects, a subsequent act granting lands to a railroad company would properly be construed to mean in alternate sections, unless the opposite purpose was expressed." But it is contended, that if the laws establishing and regulating the system of alternate sections had not expired, they were repealed by the clause of the Constitution of 1869–'70, forbidding grants to railroads; and that, by reason of the same clause, the entire act of May 18, 1873, was also unconstitutional and inoperative.

We will not pause to discuss the first proposition, though it is in opposition to the ruling in Railroad *v.* Commissioner, 36 Tex., *supra*.

In support of the second proposition, it is urged that the constitutionality of the law must be tested by the Constitution as it was on the very day that the law was adopted; and that, if unconstitutional then, it was absolutely void, and so remained, notwithstanding the amendment of the next day. The statute, it is said, is void, because it contemplated a grant forbidden by the Constitution, and attempts to provide the means of completing such an illegal grant.

Looking to the history of the constitutional amendment, we think it evident that the act objected to was passed in anticipation of its adoption. Says Justice Wheeler, in

Cain v. The State, 20 Tex., 260: "The same Legislature is supposed to be actuated in all that it does by the same mind, spirit, and intention, and to have at all times the same governing objects and policy. The artificial being is supposed to have but one mind, and that a rational and intelligent mind." Again, he says, quoting from Lord Mansfield: "All acts, *in pari materia,* are to be taken together, as if they were one law." And again: "From other laws, *in pari materia,* it thus evidently appears that the real intention was contrary to the 'literal import of the terms employed to express it in a particular part of the law.' That intention should prevail, for that, in fact, is the will of the Legislature." (Citing 9 Bac. Abr., 240.)

It is an evidence of the legislative expectation of a constitutional change, that, in 1871, an important act had been passed, in which provision was made for substituting a land grant for the bonds of the State "when the Legislature became vested with the constitutional power so to do." (See "An act to encourage the speedy construction of a railway through the State of Texas to the Pacific ocean," Special Laws, 12th Leg., 1st sess., p. 488; also Special Laws, 2d sess., 12th Leg., p. 94.)

Whilst there is no such express declaration in this statute, we think it evident that the Legislature had in view an approaching time when it would be empowered to make land grants to railroads. The object and intention, where plainly discernible from the provisions of the statute, or of other statutes, prevails over the strict letter. (Brooks v. Hicks, 20 Tex., 667.) "The court, if possible, will give the statute such a construction as will enable it to have effect." (Cooley's Const. Lim., 184.) "It is a well-settled rule of construction, that when the language of a legislative act is susceptible of two constructions, one in accordance with, the other in violation of the Constitution, the Legislature intended to use the language in a constitutional sense, and not in a sense that would violate the Constitution they were sworn to sup-

port." (Grand Rapids Co. *v.* Jarris, 30 Mich., 323.) This statute is susceptible of a construction that obviates the constitutional objection made. If the clause in the law which reads, "any lands hereafter granted in any manner to any of said companies or corporations for any such object," be construed as if it read, "any lands granted to companies after the adoption of the pending amendment of the Constitution," it would but express what we think might, from the surrounding circumstances, and to avoid nullifying the law, be held to be implied.

We know of no rule forbidding legislation looking to the contingency of a constitutional change, at least when the consummation of that change rests with the Legislature alone. (Cooley's Const. Lim., 114–117, and references; Brig Aurora *v.* U. S., 7 Cranch, 382; Bull *v.* Read, 13 Gratt., 78; State *v.* Parker, 26 Vt., 357; Peck *v.* Weddell, 17 Ohio, N. S., 271; State *v.* Kirkley, 29 Md., 85.)

But, beyond question, the leading object of the law was constitutional. That object, as declared in the title, and as apparent on the face of the act, was to set apart one half of the public domain for the support of public schools. The manner in which this object is sought to be accomplished is by requiring, as was required by former laws, all land certificates heretofore issued, as well as those hereafter issued, to any railroad company, of any nature whatever, for internal improvements or any other object, "to be located in alternate sections," and by reserving the even-numbered sections for the school fund. If the clause that follows as to lands "hereafter granted" be unconstitutional and be rejected, there is still left the body of the law, comprehensive enough in its terms to require all land certificates thereafter issued to such companies to be alternate certificates. There would seem to be no difficulty in striking out the clause objected to; for that which remains is complete in itself, and capable of being executed in accordance with the apparent legislative intent. (Cooley's Const. Lim., 178.)

Under charters granted before the adoption of the Constitution of 1869–70, railroads were receiving and would continue to receive certificates. The act operates on all certificates thereafter issued, and attempts to accomplish in regard to them the single and constitutional object of continuing in force the system of alternate surveys, and setting apart the even sections for the public school fund. Rejecting the clause in regard to future grants, sufficient remains to accomplish the object.

We do not think it material to inquire whether the statute revives the former acts referred to or not. There is enough in the act itself to fix the character of the certificates intended.

At the time the appellant's charter was granted, we hold that there was in force a general law which required the certificates to railroads to be in "alternate sections, which certificates may be located and patented on any of the public domain of this State, according to the general law on the principle of alternate sections." (Spec. Law of 1875, 84; Id., 64, 109, 113; Spec. Laws of 1874, 45–85.)

With the express legislative declaration, that these requirements were supposed to be in accordance with the general law, their insertion must be regarded as a mere precaution. It may be noticed also that, in at least two instances, that Legislature saw fit to authorize the issuance of unincumbered certificates, "and in each case the act expressly negatives the obligation to locate alternate sections for the State." (Act for relief of International R. R. Co., 1 Spec. Laws of 1875, 69; Act to encourage the construction of. canals and ditches for navigation and irrigation, Gen. Laws of 1875, 77.)

We think that the act incorporating this railroad company was passed with reference to the system of locating and surveying railroad certificates which had long been in force, and that it was the legislative intent to conform to that system, and thereby preserve uniformity in the amount and character of the bounty extended.

It may be remarked that the charter to appellant is not by

any means the only charter granted by that Legislature, which is silent as to the character of the certificates granted.

The judgment of the District Court, refusing the writ of *mandamus*, is affirmed.

AFFIRMED.

[Associate Justice MOORE dissenting.]