The opinion of the court was delivered by
Watkins, J.
This suit is a supplement to that of same title decided recently and adversely to the relators. 41 An. 585.
The relators seek, by mandamus, to compel the various respondents, as the members of the Board of Liquidation, to assemble, take action on their bonds and decide whether of not they are fundable in consolidated bonds of the State.
The respondents return:
1. That relators’ petition states no cause of action.
2. That the judicial department of the State government has no-power to control their official action, or conduct, or their exercise of official discretion.
3. That they are members of the executive department of the State government, and, as such, designated as members of said Board of Liquidation of the State debt, and that they are not responsible to the judicial department of the State government as to the time when, or the manner in which they shall perform their duties»
4. That the courts are without jurisdiction to compel them to- *649 meet, or to fix a time for their meeting, as the authority to convene the board is executive.
5. That, in their opinion, the present time is inopportune for a meeting of the board.
The judge below made the mandamus peremptory, and in his decree fixed and designated a time within which the respondents should convene and decide whether or not relators’ bonds are fund-able. Prom that judgment the respondents have appealed.
The question is, therefore, whether the courts have jurisdiction and authority over the respondents, as members of the Board of Liquidation, to compel them to meet and take action on the bonds of relators.
The respondent board was created under and by virtue of Act 3 of 1874, which was a legislative enactment, making provision for an examination into and funding of the valid part of the public debt in consolidated bonds of the State.
Sec. 1 of that act provides “ that for the purpose of consolidating and reducing the floating and bonded debt of the State, the Governor, Lieutenant Governor, Auditor, Treasurer, Secretary of State and Speaker of the House of Representatives, are hereby authorized to' cause ‘to be prepared and to issue bonds, to be known as 1 consolidated bonds of the State of Louisiana,’ * * * to the amount of $15,000,000, or so much thereof as may be necessary,” etc.
See. 2 provides “ that the parties designated in the foregoing section shall constitute a board of liquidation, and a majority of said board shall elect a fiscal agent for the State, who shall be a member of said board.”
Section 3 provides “ that the bonds authorized by Sec. 1 shall be signed by the Governor, Auditor, and Secretary of State, * * * and, when so prepared, said bonds shall be exchanged by the Board: of Liquidation for all valid outstanding bonds of the State, and all valid warrants, drawn previous to the passage of the act, * * at the rate of sixty cents in consolidated bonds for one dollar in outstanding bonds and all valid warrants; provided, that the holder of any bond, or valid warrant, rejected by a majority of said board may apply by petition, to the proper court, for relief, and if final judgment shall be rendered in his favor, against said board, it shall be the duty of said board to fund his claim in bonds, at the rate' provided by this act,” etc.
*650 That this was intended as a scheme for the ascertainment and reduction of the public debt within a prescribed compass will appear by reference to the provisions of Sec. 13 of the act, which are as follows, viz:
“ That the entire State debt, prior to the year of our Lord 1914 shall never be increased, directly or indirectly, beyond the sum of|15, - 000,000, hereby authorized, it being the intent and object of this act, and of the exchanges to be effected thereunder, to reduce and restrict the whole indebtedness of the State to a sum not exceeding ‡16,000,000, and to agree with the holders of the consolidated bonds to be issued hereunder that said indebtedness shall not be increased beyond said sum during said period. ” (Our Italics).
This act was approved on the 24th of January, 1874, and, at the same time, a constitutional amendment was proposed confirmatory of the scheme, and which declares that the consolidated bonds to be issued under and in pursuance of that act shall be valid and binding contracts of the State, in favor of the holders thereof.
Under the Constitution of the State, in force at the time, as well as under the one now in force, the executive department of the State government was composed exclusively of the officers enumerated in the funding law, as composing the Board of Liquidation, with the exception of the Speaker of the House of Representatives, who is an officer of the political department of the State.
When we take into consideration that the object in view was to liquidate the public debt, which consisted at the time of many millions of dollars in excess of the proposed limitation, evidenced by bonds and warrants of various series, and in exchange for which consolidated bonds were to be given, it is manifest that a political question of serious importance was presented for the consideration of the General Assembly, and that they wisely conceived the idea and devised the funding scheme, and gave it in charge of the executive department of the State government, with the solitary super-addition of the Speaker of the House of Representatives,' as the most suitable exponent of the political power of the State. Or, in other words, a case is presented where the political department of the State has delegated to the executive department thereof the authority to examine into and place a limitation upon the State debt, by funding miscellaneous evidences of debt into consolidated bonds of the State.
At most the funding law merely extends a grace to the public cred *651 itors of the State, of which they have the option to avail themselves under the exceptional circumstances stated. In case creditors elect to do so, and any one- of their'claims should be disputed and disallowed by the respondent, such creditor has the right to have its legality tested in the mode pointed out in Section 3 of the act. That is the particular manner and event in which the State has consented to submit herself to the jurisdiction of the courts in the premises, and the statute points out the formula, or ceremonial, of the judicial procedure, and expressly limits action in the premises. Lord Cecil vs. The Board of Liquidation, 30 An. 35; State ex rel. New York Guaranty Co. vs. Jumel, 38 An. 337; State ex rel. Newman vs. Funding Board, 39 An. 395.
Act 11 of 1875 supplemented, only, the authority conferred by the statute of 1874, in the following particulars:
1. By authorizing any tax payer to institute suit in his own name, or to intervene in any pending suit, for the purpose of testing the legality or validity of any issue of bonds or warrants, and to inquire into the consideration for which same’ issued.
2. To restrain the board from funding such bonds or warrants until their validity shall have been finally determined by this court.
3. By making an enumeration of the various issues of bonds and warrants which were deemed of doubtful validity.
4. By declaring that the presidents of the New Orleans Cotton Exchange and of the Board of Trade shall be members of the board, with the proviso, ‘ ‘ that any delay, refusal, or inability of either, or both of said last named persons to qualify as members of said board, or of the non-existence of either, shall not affect the validity of the said board and its acts; and a majority of said board shall be required in order to perform any ofiieial act.” Acts of 1875, p. 110, et seq.
It is apparent that this statute did not change the autonomy of the board as originally organized; on the contrary, it expressly provides that the addition of the presidents of two New Orleans exchanges shall not alter the status of the board; that the failure or refusal of either to act shall not affect the validity of the board or its acts; and that “ a majority of said board shall be required in order to perform any official act.” Evidently, the presidents of the exchanges were intended to be advisory members only, and their addition did *652 not, in any way, affect the character of the organization as an executive body charged with the performance of political functions.
Indeed Act 58 of 1877, amendatory of Section 2 of Act 3 of 1874,. omits the presidents of the exchanges entirely, while it reiterates all others.
As drawing, very clearly, a line of distinction between the political powers which the board was to perform, and the judicial power the courts were authorized to exercise, we refer to what was well said in this case, when it was last before us, viz: “The State has given permission for a certain class of obligations to be presented by the holders of them to Louisiana courts for determination, as to their validity, and thus, in authorizing suit against herself, she has pointed out the channel through which it must reach the coui’ts, and it must be followed.” Hope & Co. vs. Board of Liquidation, 41 An. 535. Butwe are requested to, go much further, now, and coerce the aetion of the board; not in reference to the recognition vel non of the claims of' creditors, but in reference to the propriety of its meeting at all, and the designation of the time when and the place where it shall meet, and the purposes for which the meeting is to be held. When we reflect upon the object to be attained by the funding scheme, and that the total debt was to be thereby reduced to $15,000,000; and then consider that the holdings of the relators amount to more than $4,000,-000 in capital, alone, it may be a question of serious consideration with the respondents when they should take action in the premises. It may well be that the precipitation of an issue of such grave moment as that of the allowance vel non of a claim, equal in amount to one-fourth of the public debt, at an inopportune moment, might prove embarrassing to the State, and seriously affect her credit at a. time of greatest need.
It was made a question before our immediate predecessors, whether a loan proposed to be made by the Legislature to the New Orleans Pacific Railway Company, in' 1878, was not unconstitutional, because the fifteen million limit to the State debt, contemplated and provided in the funding laws, and the constitutional amendment of 1874 had, theretofore, been reached, and on that question they said: “This, legislation — the funding bill and the act proposing the constitutional amendment — followed immediately upon the submission to the General Assembly of the Auditor’s report of January 1, 1874, wherein is. this statement and information.”
*653 Then follows a quotation from the Auditor’s report, giving in detail the amounts of warrants and bonds representing “the actual debt of the State” which he esteemed fundable, and the aggregate of which was $24,356,338.72. The opinion then proceeds: “In a tabulated statement appended to the report and forming one of the exhibits, the total amount of the bonded debt of the State for which the State is actually liable, is fixed at the figures above set forth, and there are then itemized other bonds for which the State is contingently liable, amounting to $4,853,683.33, which, with a sum stated as the ‘ miscellaneous debts ’ of the State, make up a sum of $30,000,000. In exact figures, it is that sum less $827.17. The funding of that sum at the rate suggested by the Auditor and adopted by the Legislature will create a consolidated debt of $18,000,000. The funding of the sum stated by the Auditor as the actual debt of the State will create a debt of a little less than $15,000,000. It is obvious that the plan both of the Auditor and the Legislature embraced only the latter sum, or, in other words, that it excluded the bonds loaned to the Citizens’ Bank, and the Consolidated Planters’ Association, which amounted in round numbers to the sum above stated, as a debt for which the State was contingently liable.”
In the concluding part of the opinion the court say: “It is impossible that the contingent liability of the State upon the bonds loaned to the Citizens’ and Consolidated Banks should have entered into the plan, because the funding of them with the other liabilities will produce a sum greatly exceeding that .fixed by the act and the amendment.” State ex rel. New Orleans Pacific Railway Company vs. Nicholls, Governor, 30 An. 980.
When we reflect upon the fact that the relator’s bonds are the bonds there under consideration, the difficulty of the situation is increased, and the urgency of relegating the whole matter to the discretion of the Board of Liquidation, and ultimately to the Legislature, is increased. It is quite true that this might be an argument against the bonds when put upon their merits before the board for allowance, but it also affects the question now before us, as to whether it was contemplated that the judiciary should take action in the premises. We think it is clear that.we should not; and, as our - duty to grant the extraordinary relief afforded by mandamus has not been made ■plain and unmistakable, we ought to refuse it, and shift the burden *654 on the shoulders of the Legislature, who are better capacitated to deal with the question than the judiciary are.
This question is now presented and contested for the first time, and no case cited, and none that we have been able to find, is at variance with the view we have expressed. We have examined the following cases, viz: State ex rel. Board of Supervisors vs. Board of Liquidation, 30 An. 816; Louisiana National Bank vs. Board, etc., 30 An. 1356; State ex rel. Bartlette vs. Board, etc., 31 Án. 273; State ex rel. Meyers vs. Board, etc., 33 An. 124; State ex rel. Bank vs. Board, etc., 29 An. 264; State ex rel. Forstall vs. Board, 29 An. 690; Manning vs. Board, etc., 39 An. 343; Jardet vs. Board, 40 An. 379; State ex rel. Newman vs. Funding Board, 39 An. 395; Oliver vs. Board, etc., 40 An. 321; Sage vs. Board, etc., 37 An. 413; Adams & Co. vs. Board, 39 An. 689; State ex rel. Forstall vs. Board, etc., 29 An. 692; and find no contrary principle announced therein; and we apprehend none can be found in opposition to it.
That mandamus will go to State officers for the performance of purely ministerial functions, has been decided in many cases, among which the following may be cited: State ex rel. McCurley vs. Auditor, 27 An. 429; State ex rel. Mentz vs. Auditor, 28 An. 47; State ex rel. Longstreet vs. Treasurer, 28 An. 932; State ex rel. Merle vs. Treasurer, 26 An. 132; State ex rel. Jumel, Auditor, 30 An. 861; State ex rel. Moss vs. Jumel, Auditor, 31 An. 142; State ex rel. Ecuyer vs. Burke, Treasurer, 33 An. 966; State ex rel. Campbell vs. Steele, Auditor, 37 An. 355.
But it has long been a question of delicacy and great difficulty for the courts of this country, State and Federal, of last resort to determine where the exact line of demarcation is to be drawn between political and executive duties, for the performance of which mandamus will not go to a governor of a State, and purely ministerial duties, for the performance of which the writ will lie.
As applicable to the question in hand, we may cite State ex rel. Oliver vs. Warmoth, Governor, 22 An. 1, in which our predecessors expressed themselves as follows, viz:
“When the official acts to be performed by the excecutive branch of the government, are divided into ministerial and political, and courts assume the right to enforce the performance of the former, it opens a wide margin, for the exercise of judicial power. The judge may say what acts are ministerial, and what political. Circumstances may *655 arise, and conditions may exist, which would require the governor of a State, in the proper exercise of his duty, and with due regard to the interests of the State, not to perform a ministerial act. Is the judge to determine his duty in such a case, and compel him to perform it? The reasons of the executive for the non-performance of an act, the judge may never know, or, if brought to his knowledge, he may review and overrule them; and, in so doing, assume political functions. He would determine, in such case, the policy of doing the act. The Legislature which prescribed the act might hold the executive harmless, while the judge condemned him.” (Italics in quotation are ours.)
In our opinion, the very difficulty, suggested by the court, in that opinion, has arisen, and is confronting us here — the rightfulness of the exercise of judicial power, for the purpose of coercing “the executive branch of the government,” in the performance of duties, which it, in the proper exercise of its discretion, and with due regard for the interests of the State, declines to .perform.
If it be, even, conceded that it is questionable whether the duties assigned to the funding board are purely ministerial, this court would “ open a wide margin for the exercise of judicial power,” in assuming that they are, and making the mandamus peremptory. The question of greatest importance — and that which is uppermost in the executive mind — is, what, under the circumstances, is the proper exercise of executive duty in the premises, with due regard to the welfare of the State? Can the judiciary, with due regard to the funding scheme, decide the question thus arbitrarily, and by mandamus compel the respondents to act?
Another decision of our predecessors, construing a similar funding statute, has peculiar significance (in respect to the one under consideration), wherein a judgment refusing a peremptory mandamus against a board of liquidation was affirmed. The court invited special attention to the fact that “the words used are ‘authorized and empowered,’ as exercising a controlling influence, over the performance of duty by the Board of Liquidation.” State ex rel. Burnet vs. Warmoth, Governor, 28 An. 76.
In this connection, it is a noteworthy fact, and should be taken into consideration, that the only words employed in the funding laws of 1874 and 1875, with regard to the powers or the organization of the board, are “that the parties designabed in foregoing section shall *656 constitute a board of liquidation.” In the case last referred to, the court said, of the statute considered, that “the act which the members of the board was required to do was ministerial, and from its very nature involved a discretion in them, in regard to the manner of doing it." State ex rel. Smith & Co. vs. Board of Liquidators, 23 An. 388.
The same rule of interpretation is applicable to the respondent board under the law of 1874.
This seemed to be the view entertained of it by our immediate predecessors, who, in considering an application for mandamus to the respondent board, said: •
The writ “ is not granted in doubtful cases. To warrant the relief, the relator must have a clear and legal right to the performance of a particular act, or the fulfilment of a particular duty, at the hands of the respondent, and this right must be a complete, and not merely an inchoate right. High’s Ex. Le. Rem. Sees. 7, et seq. To justify the issuance of the writ in this case, the relator must have a present and perfect right to have the bonds presented by him, funded, and it must be the respondent’s duty to fund them — a duty, the performance of which is not discretionary on the one hand — a right which is not inchoate and imperfect on the other." State ex rel. Exchange Bank vs. Board, 29 An. 264. Counsel for relators cite with reliance an opinion of the Indiana Supreme Court, which says:
“ But the question whether a mandamus will lie against the Governor to enforce the performance of an executive duty does not arise in this ease. The duty of the Governor, in connection with the other officers named in the act, is not executive. The executive power of the the State is vested solely in the Governor. Constitution, Art. 5, Sec. 1.
“Any power or authority vested by legislation in the Governor together with other officers or persons, in which they are to have an eqnal voice with him, can not be executive, as he alone is vested with the executive power of the State. Any duty which he is by law required to perform in connection with others, in which they have an equal voice -with him, can in no sense be said to be an executive duty.
“The Governor and the other officers named in the act may be regarded as constituting a board, organized by the Legislature for the performance of certain duties; and a mandamus will lie against *657 them to enforce the performance of the duties prescribed.” Gray, etc. vs. Coghlin, etc., 72 Ind. 578.
But that opinion is not applicable here for two reasons: (1) Because “the executive power of the State” of Louisiana is not exclusively vested in the Governor, only “ the supreme executive power;” (2) because “ the other officers named” in the funding statutes of 1874 are themselves members of the executive department of the State government. Hence this is not a case where the Governor is merely designated as ex virtute officii a member of a board in connection with other persons which is charged with the performance of certain des1ignated ministerial duties. On the contrary, the law declares that “ the Governor, Lieutenant Governor, Auditor, Treasurer, Secretary of State and Speaker of the House of Representatives * * shall constitute a Board of Liquidation.” Such officers have acted, and when their terms of office have, from time to time, expired their successors in office have taken their places in the Board of Liquidation without any formal reappointment or investiture with any insignia of office as such. The-board is a continuing one, only subject to legislative recall.
There are many cases in which the courts of different States have held that mandamus will go to the chief executive officer of a State, but for the performance only of specific ministerial duties. Of that class we cite the following, viz:
Bonner vs. The State of Georgia, 7 Ga. 481; State ex rel. Whiteman vs. Chase, Governor, 5 Ohio St. 228; State vs. Governor, 7 Ohio St. 372; Attorney General vs. Bamstead, 4 Wis. 567; Cotton vs. Ellis, Governor, 7 Jones (Law) N. C. 545; State ex rel. Wall vs. Blasdell, 4 Nevada 241; State ex rel. Lockwood vs. Kirkwood, 14 Iowa 162; Harpending vs. Knight, Governor, 39 Cal. 189; McCurley vs. Brooks, 16 Cal. 11; Middleton vs. Law, 30 Cal. 596; Street vs. Haight, Governor, 39 Cal. 87; Chamberlain vs. Sibley, 4 Minn. 312; McGurdes vs. Swan, Governor, 25 Md. 173; Groom vs. Goomor, 43 Md. 572; Railroad vs. Moon, 36 Ala. 382; Grover vs. Nelson, 6 Ind. 496; Baker vs. Kirke, 33 Ind. 517; Chummassero vs. Potts, 2 Mo. 242.
We cite these merely for the purpose of showing that in a variety of cases, and in different courts of the country, mandamus has gone 'to the chief executive officer only when the law had imposed on him, ■either alone or in connection with other persons, the performance of *658 specific ministerial functions, superadded to those devolving upon him under the Constitution and general laws of the State. Bnt even on this question there are quite as many and quite as respectable authorities which express a contrary view, and in the following cases it has been held that in no case will the writ of mandamus lie to the chief executive of a State. People vs. Hatet, 33 Ill. 9; State vs. Deslonde, 27 Ala. 71; State vs. Deke, 20 Minn. 363; Railroad vs. Randolph, 24 Texas 537; Rhodes vs. Railroad Co., 40 Texas 537; Railroad Co. vs. Graves, 47 Texas 428; Chalk vs. Darden, 47 Texas 438.
In the following cases doubt is expressed as to the allowance of the writ, and limiting its employment to extreme cases: Hawkins vs. Governor, 1 Ark. 570; State vs. Drew, 17 Fla. 67; Low vs. Townes, 8 Ga: 360; People vs. Bissell, 19 Ill. 229; People vs. Yates, 40 Ill. 126; Durant vs. Governor, 32 Maine, 508; People vs. Governor, 29 Mich. 320; Rice vs. Austin, 19 Minn. 103; Railroad Co. vs. DeGraff, 27 Minn. 1; Railroad Co. vs. Lowry, 61 Miss. 102; State vs. Governor, 39 Mo. 389; State vs. Governor, 25 N. J. (Law) 331; Hartrauft’s Appeal, 85 Penn. St. 433; Maurin vs. Smith, 8 R. I. 192; Turnpike Co. vs. Brown, 8 Baxter, 490.
This extensive examination of and research into adjudicated cases has satisfied us of the correctness of the general proposition, that, whenever, by the constitution and laws of a State, officers of the executive branch of the government are vested with discretionary fmictions, in the performance of civil duties, or political powers and responsibilities are devolved upon them, they are not answerable to judicial process, but that their acts are only examinable politically. From this proposition the supplemental one may be deduced, that when such duties and powers devolve upon the executive branch or department of the State government, as a whole, as in this case, the members of the board thus constituted are likewise exempt from judicial control; and, notwithstanding that some of the officers, respectively, are subject to judicial control, and can be coerced by mandamus: to act, and to perform “ their ordinary official duties.” Such is the purport of United State vs. Dunlap, 128 U. S. 40; Kendall vs. United States, 12 Peters 524; United States vs. Schurz, 102.U. S. 378; Decatur vs. Paulding, 14 Peters 497.
On reason and authority we think the judgment should be reversed.. *659 It is therefore ordered and decreed that the judgment appealed from be reversed; and it is further ordered that a peremptory mandamus be refused at relator’s cost in both courts.