**NEFF et al. v. ELGIN.   (No. 7366.)\***

(Court of Civil Appeals of Texas.   San Antonio.   Feb. 25, 1925.   Rehearing Denied March 18, 1925.)

**1. Constitutional law &#9758;45—Courts have duty and power to uphold organic paramount law and disregard, as unconstitutional, conflicting legislative acts.**

It is duty and power of courts to uphold organic paramount law of land and disregard as unconstitutional every legislative act in conflict with it, and hence to pass on constitutionality of laws.

**2. Constitutional law &#9758;45, 48—Power to declare statute unconstitutional is exercised only in protection of personal rights, and not if same result otherwise obtainable.**

Power to declare statute unconstitutional is used only in preservation of personal rights against unwarranted legislation, and case should never be disposed of by declaring statute unconstitutional when same result can be properly and legally reached in some other way.

**3. Constitutional law &#9758;26 — Legislature has unrestricted lawmaking power in every matter not expressly or impliedly withdrawn by Constitution.**

Legislature has unrestricted lawmaking power in every matter not expressly or impliedly withdrawn by Constitution.

**4. Constitutional law &#9758;48—Assailant of constitutionality of act has burden of establishing its invalidity.**

Assailant of constitutionality of act has burden of establishing its invalidity.

**5. Constitutional law &#9758;48—Statutes held constitutional unless clearly otherwise, and construction resulting in constitutionality must prevail.**

Statutes must be held constitutional unless clearly otherwise, and where susceptible of two constructions, one upholding, the other destroying, the first must prevail.

**6. Constitutional law &#9758;26—Constitution does not prohibit Legislature's creation of law enforcement agencies other than those named in it.**

Constitution, particularly article 4, §§ 7, 10, does not expressly or impliedly deny Legislature power and authority to create other agencies than those named in it for preservation of law and suppression of crime, as was done by enactment of State Ranger Act, as amended by Acts 1919, c. 144, § 1 (Vernon's Ann. Civ. St. Supp. 1922, arts. 6754–6766½).

**7. States &#9758;68—State Ranger Act held not invalid as authorizing usurpation by rangers of prerogatives of county sheriffs.**

State Ranger Act, as amended by Acts 1919, c. 144, § 1 (Vernon's Ann. Civ. St. Supp. 1922, arts. 6754–6766½), is not invalid as authorizing a usurpation by rangers therein provided for of prerogatives of county sheriffs whose duties are defined by Legislature under authority of Constitution.

**8. Constitutional law &#9758;42—Objection to constitutionality of act by party whose rights it does not affect will not be heard by courts.**

Objection to constitutionality of act by party whose rights it does not affect will not be heard by courts.

**9. States &#9758;48—Statutes &#9758;64(2)—Provision of State Ranger Act for oath to be taken by rangers held not unconstitutional. .**

Provision of State Ranger Act, as amended by Acts 1919, c. 144, § 1 (Vernon's Ann. Civ. St. Supp. 1922, arts. 6754–6766½), that ranger shall take oath to perform his duties in accordance with law, is not violative of Constitution as prohibiting ranger from taking constitutional oath, and, if invalid, does not invalidate other portions of act.

**10. States &#9758;119—State Ranger Act held not invalid as loan of state's aid and credit to ranger force.**

That State Ranger Act, as amended by Acts 1919, c. 144, § 1 (Vernon's Ann. Civ. St. Supp. 1922, arts. 6754–6766½), provides state will furnish ranger with carbine and pistol at cost and deduct price from his first salary, does not render act invalid as loan of state's aid and credit to ranger force.

**11. Officers &#9758;19—State Ranger Act held not invalid as attempt to give Governor another office.**

State Ranger Act, as amended by Acts 1919, c. 144, § 1 (Vernon's Ann. Civ. St. Supp. 1922, arts. 6754–6766½), held not invalid as attempt to give Governor another office because placing ranger force under his command.

**12. Statutes &#9758;219—Past construction of act by state officers and Legislatures should carry weight with courts.**

Construction placed upon laws for many years by past officers and Legislatures should have great weight with courts weighing constitutionality of act, and should be sufficient to resolve doubt in favor of validity.

Appeal from District Court, Bexar County; R. B. Minor, Judge.

Suit for injunction by John E. Elgin against Pat M. Neff and others. From a judgment for plaintiff against all but named defendant, defendants appeal. Judgment reversed, injunction set aside, and cause dismissed.

Dan Moody, Atty. Gen., and C. A. Wheeler, Asst. Atty. Gen., for appellants.

Watson & Chapin, of San Antonio, for appellee.

FLY, C. J.   This is a suit by appellee against Pat M. Neff, as Governor of Texas, Lon A. Smith, its comptroller of public accounts, C. V. Terrell, its treasurer, Thomas D. Barton, its adjutant general, B. W. Aldrich, its commissary and paymaster of the ranger force, B. C. Baldwin, captain of a ranger company, the Southwestern Bell Telephone Company, "and all other officers, privates, and employees of said ranger force

in Texas, whose names are to the plaintiff unknown"; and the petition prays for an injunction to restrain them and each of them from doing anything to recognize the existence of the ranger force or give it aid and comfort, on the ground that title 116, of the Revised Civil Statutes of Texas, containing articles 6754 to 6766, inclusive, as amended, and article 6766a, as added by Acts 1919, c. 144, § 1 (Vernon's Ann. Civ. St. Supp. 1922, arts. 6754–6766½), are unconstitutional and the ranger force has therefore no legal existence. The petition was filed on August 1, 1924, and on August 2d, a temporary writ was granted. The cause was submitted to the trial judge on December 1, 1924, and on January 15, 1925, he overruled all of the exceptions to the petition except as to Pat M. Neff, Governor, and rendered the following judgment:

"It is therefore considered, adjudged, and decreed by the court that the defendants hereinafter named be and they are hereby permanently enjoined and restrained, respectively, as follows:

"(1) The defendant Lon A. Smith, as Comptroller of the State of Texas, is hereby enjoined and restrained from issuing warrants on the state treasury covering any expenditures made or incurred by the Governor, Adjutant General, or any officer or member of the ranger force, under or by virtue of any of the provisions of an act of the Legislature of the State of Texas approved March 31, 1919, entitled, 'An act to amend title 116, the Revised Civil Statutes of the State of Texas including articles 6754, 6755; 6756, 6757, 6758, 6759, 6760, 6761, 6762, 6763, 6764, 6765, 6766 be amended and article 6767 added thereto, said act providing for the organization of a ranger force for the protecting of the frontier against marauders or thieving parties; for the suppression of lawlessness and crime throughout the state; to prescribe the duties and powers of members of such force; to regulate their compensation; and declaring an emergency.'

"(2) The defendant S. L. Staples, as Treasurer of the State of Texas, is hereby enjoined and restrained from paying out or disbursing any funds of the state of Texas for the support or maintenance of said ranger force, or for any other purpose authorized by said act of the Legislature.

"(3) The defendant Thomas D. Barton, as Adjutant General of the State of Texas, is hereby enjoined and restrained from disbursing any of the funds of the state of Texas for or on behalf of said ranger force or any member thereof or of any of its employees, and from approving any vouchers, accounts, or claims, drawn against the public funds of the state of Texas for or on behalf of said ranger force or any of its members or employees, and from authorizing or directing any one else to pay out any of said funds or to approve any vouchers or claims drawn thereon for or on behalf of said ranger force or any of its members or employees.

"(4) The defendant R. W. Aldrich, as Quartermaster, Commissary and Paymaster of said ranger force, is hereby enjoined and restrained from paying out any of the funds of the state of Texas for or on behalf of the said ranger force or any of its members or employees and from issuing, receiving, or approving any voucher or claim drawn against said funds on behalf of said ranger force, and from receiving, as a salary or otherwise, any of the funds of the state in payment for his services as quartermaster of said ranger force.

"(5) The defendant B. C. Baldwin, as captain of one of the companies of said ranger force, is hereby enjoined and restrained from receiving his salary as fixed by said act of the Legislature, as such ranger captain, or any part thereof, and from receiving any other sum or sums of money of the state for services or salary or maintenance as such ranger captain.

"(6) The defendant Southwestern Bell Telephone Company is hereby enjoined and restrained from cashing any warrant, or voucher, issued to it, against the public funds of the state, for services rendered for said ranger force or any of its officers, privates, or employees, and from receiving any money from said state for any services, rendered or to be rendered, by it for or on account of said ranger force or any of its officers, privates, or employees.

"The injunction herein against each of the before-mentioned defendants, enjoined, shall apply and be obligatory upon their respective subordinates, agents, servants, and employees.

"It is further considered, adjudged, and decreed that the plaintiff, John E. Elgin, recover against the defendants other than defendant Pat M. Neff, Governor of Texas, his costs in this behalf expended; and that all costs of this suit be paid by the defendants other than the defendant Pat M. Neff, Governor of Texas."

It is alleged in the petition that the law of 1919 is violative of 6 sections of the Bill of Rights, and 5 articles of the Constitution of Texas, and that it is void because it is in derogation of some 24 or 25 constitutional rights of appellee and the rest of the people of Texas. Some of the grounds alleged for the granting of the injunction were the acts of the Adjutant General in "employing spies, stool pigeons, informers and detectives 'to work in connection with the ranger force." Of course, only the constitutionality of the law is involved. The court found no facts and gave no conclusions of law. The facts agreed on are:

"That plaintiff John E. Elgin is a property owner and taxpaying citizen of the state, of Texas, and a resident of Bexar county, Tex., and was such at the time of the institution of this suit and now is such property owner and taxpayer.

"That each of the named defendants are acting officially in the capacities stated in plaintiff's first amended petition in carrying out and attempting to carry out the provisions of the act under consideration, and that compensation is being paid to the defendants named as rangers, officers and privates as provided in said act of the Legislature; said salaries and expenses being paid on warrant issued by the defendant Lon A. Smith, Comptroller, and paid out of the funds of the state of Texas by S. L. Staples, as treasurer of the state of Texas.

"That under the direction of the Governor and Adjutant General a company of said rangers has been kept and maintained in the city of San Antonio, for at least one year prior to the institution of this suit, and that said company of rangers is still being kept and maintained in said city."

[1, 2] One of the most delicate duties to be performed by the judicial branch of the government is that of declaring an act of the legislative department invalid and unconstitutional. Our government, national and state, has been divided into three co-ordinate branches, one of equal dignity and responsibility with the other, and each supreme within the exercise of its proper functions, and cannot while so acting, directly or indirectly, be controlled, meet with interference, or be under the supervision or dictation of any other branch. Such assumption of supervision of one branch of the government would be subversive of the system and lead to inextricable confusion. It has been a subject of discussion and argument as to the power of courts to declare acts of the Legislature invalid at any time or under any circumstances, but the more reasonable and only tenable position is that as it is the duty of the courts of the land to construe laws and pass on their meaning, they must uphold the organic, the paramount law of the land, and in construing it they must disregard every legislative act in conflict with that paramount law. Terrell v. Middleton (Tex. Civ. App.) 187 S. W. 367. The judiciary claims no precedence, nor superiority over the legislative department, but they must and will enforce and administer the organic law and not accede to any infraction of it no matter by whom attempted. While it is the solemn duty of a court to pass upon the constitutionality of laws coming under its inspection and consideration, still it is a duty of the most delicate nature and must be performed with the utmost care and circumspection. But the duty rests upon courts, especially those of higher rank and jurisdiction, and should never be evaded merely on grounds of respect for and courtesy towards the legislative body, and no case should ever be decided by declaring a statute unconstitutional when the same result can be properly and legally reached in some other way. The power to declare statutes unconstitutional is only used in the preservation of personal rights against unwarranted legislation and for that purpose alone. Wellington, Petitioner, 16 Pick. 87, 26 Am. Dec. 631. The sum and substance of the matter is that the acts of Legislatures are not to be struck down without the greatest care and consideration, and after eliminating every reasonable doubt as to their constitutionality. The Parliament of Great Britain, the prototype of American legislative bodies, or, as Burke expresses it, "their great precursor and prototype," is not bound in its legislation by constitutions, and of course there could be no questions of constitutionality of parliamentary acts. American rights, however, are hedged about by guaranties of a written Constitution across whose lines, marking human rights, no American Legislature can pass, and when such barriers are passed, under the rules and restrictions hereinbefore expressed, the courts will repel the inbefore expressed, the courts will repel the assault by upholding and defending the Constitution.

[3, 4] The power of our Legislatures to enact laws is full and complete, subject to no restrictions except those provided by the Constitution of the state. The Legislature is not a mere agency for the exercise of specially defined powers, but it is clothed with a general authority to enact laws at discretion for the people of the state. The Constitution merely demands of it that it shall not usurp the powers of the executive or judicial departments. The lawmaking power has committed to its hands every matter of legislation not expressly or impliedly withheld by the Constitution, and he who assails the constitutionality of an act of the Legislature has the burden of showing the invalidity of the law. Cooley's Constitutional Limitations, p. 126 et seq.

[5] From the first reported Texas cases we find that the rule has been invariably followed, that every statute must be held to be constitutional unless it is clearly otherwise, and where a statute is susceptible of two constructions, one upholding and the other destroying the statute, the first construction must prevail and the law be declared constitutional. Sutherland v. De Leon, 1 Tex. 250, 46 Am. Dec. 100; Railway v. Gross, 47 Tex. 435; Life Ins. Co. v. Ray, 50 Tex. 519; Maud v. Terrell, 109 Tex. 97, 200 S. W. 375. The rule is thus stated in the last-cited case by Chief Justice Phillips:

"An act of the Legislature is not to be declared unconstitutional unless plainly so. The presumption is that the Legislature acted in the light of the Constitution, with the intention to observe it rather than violate it. Where the language of the particular enactment is unambiguous and the conflict with the Constitution is hence apparent, there is no alternative but to declare the enactment void. In such cases words cannot be read into a statute or out of it to save it. But where the language is of doubtful meaning, reasonably susceptible of different constructions, rendering the act valid if construed in one sense and invalid if construed in another, that construction will be adopted which sustains the act rather than destroys it. Likewise, where the terms used in a statute are general, reasonably admitting of a construction which does not condemn it, the language will be restrained in its operation so as to harmonize the statute with the Constitution. * * * These are just and wise rules. They are of general application."

Keeping these well-defined and firmly established rules in view, that should govern the judicial branch of the government in the construction of the statutes enacted and promulgated by the legislative department, we will proceed to consider the laws held to be invalid by the trial judge. The law in question was enacted by the Thirty-Sixth Legislature in 1919, being articles 6754 to

6766a, inclusive, and is denominated the "State Ranger Act." It was passed in lieu of an act of 1901, which appears in Vernon's Sayles' Texas Civil Statutes of 1914, as articles 6754 to 6766, inclusive. The statute provides for the organization of the ranger force as follows:

"The ranger force authorized to be organized by the Governor is for the purpose of protecting the frontier against marauding or thieving parties, and for the suppression of lawlessness and crime throughout the state, and to aid in the enforcement of the laws of the state." Article 6754.

The only additional purpose given in the law of 1919, to those expressed in the statute of 1901, is "and to aid in the enforcement of the laws of the state," which is probably comprised in the purpose "for the suppression of lawlessness and crime throughout the state."

The law of 1919 created no new agency for the suppression of crime and lawlessness throughout the state, for before the first gun of the Texas revolution was fired at Gonzales in December, 1835, before the Declaration of Texas Independence was adopted, before the heroes of the Alamo laid down their lives for freedom, and before the Mexican Army under Santa Ana was destroyed by Sam Houston at San Jacinto, a ranger force was organized in Texas. It was the first organized agency of the Anglo-Saxon immigrants against the lawlessness and disorder which prevailed under the inadequate protection extended to them by Mexico, and from that time on, through the existence of Texas as an independent republic, as a state of the American Union, during its troubled existence as a seceding state, and after its return to the Union, through carpet bag régime and up to the time when the whole system was sought to be demolished and destroyed in the name of the Constitution of the state. The first force organized was known as "Rangers," for the provisional Governor reported to the council in 1835 that—

"Provisions have already been made for the organization of a corps of rangers, and I conceive it highly important that you should place a bold, energetic and enterprising commander at their head. This corps, well managed, will prove a safeguard to our hitherto unprotected frontier inhabitants, and prevent the depredations of those savage hordes that infest our borders. I conceive this very important at this moment as it is known that the Mexican authorities have endeavored to engage them in a war with us."

Following up the recommendation of the governor, the committee on military affairs reported to the council an ordinance providing for a ranger force of 168 men, divided into three companies of 56 each, to be commanded by a captain and a first and second lieutenant; the three companies, constituting a battalion, to be commanded by a major. The first captains were Isaac W. Burton,

William H. Arrington, and John J. Tumlinson, and R. M. Williamson was appointed the first major. This ranger force was an organization not connected with the army, organized by the same council, but was independent of the army with different ends in view. Journals of the Consultation, 1 Gammel's Laws of Texas, p. 524 et seq. By an act of the Texas Congress of December 5, 1836 (1 Gammel's Laws, p. 1113), the president of the republic was required to organize a battalion of mounted riflemen, consisting of 280 men for the protection of the frontier, to be officered in like manner as the balance of the army. The men in this organization furnished their own horses, rifles, and brace of pistols. That organization was separate from the militia, for which provision was made on the following day. The law authorizing the organization was continued under the provision of the state Constitution of 1845, and the Constitution of 1861. The force was increased to 1,000 men during the years 1861 to 1865. The ranger force was continued under the same laws until April 10, 1874, when a law was passed to provide for the protection of the frontier of the state of Texas against the invasion of hostile Indians, Mexicans, or other marauding or thieving parties." 8 Gammel's Laws, p. 86 et seq.

No doubt the language of the statute of 1874, if strictly construed, would have confined the use of the ranger force to frontier counties and to repelling therein the invasion of Indians and Mexicans or marauding or thieving parties. That law was in existence until another law was enacted in 1879 (Laws 1879, c. 152), when it was amended by reducing the pay of officers and men. While the law of 1874 was in effect, the rangers took the field, one company being given the territory along the main fork of the Brazos river, another on the Nueces river, and the remaining companies were posted along the line between the two companies mentioned; the command of about 450 men guarding a line of over 500 miles in extent. They were under the command of that very able Adjutant General John B. Jones, who won the confidence and admiration not only of his brave organization, but also that of the people of the state. The rangers cleared the frontier of Indians, and then, in the language of their captain, brave, gallant J. B. Gillett, they turned their attention "to the other pests of the state—thieves, bandits and fugitives from justice." In his book "Six Years with the Texas Rangers," Capt. Gillett states that the organization "became in an incredibly short time the most famous efficient body of mounted police in the world." This is a true statement, and Canada and states of the American Union have found it expedient to organize like forces of men to assist the civil authorities in apprehending criminals and in enforcing the laws under the executive heads of the government.

Not only did the ranger forces operate along what might then have been deemed the frontiers of Texas, but they are found at all times co-operating with the sheriffs and other peace officers in bringing criminals who had been guilty of atrocious crimes to justice, and who had organized and were defying the officers of the law. Bands of thieves and murderers in Atascosa, Lampasas, and other counties, were attacked and destroyed. Governor Coke sent rangers into Lampasas county to assist the civil authorities in suppressing a feud there. The forces also operated, in 1878, in Wise, Denton, and Dallas counties. The headquarters of the battalion of rangers was in' Austin, and Adjutant General Jones always kept a group of four or five rangers in a camp on the capitol grounds, and out of this group he sent Dick Ware, Connor, and Harold to Round Rock, Williamson county, to intercept the noted bandit Sam Bass there. They co-operated with the sheriff of Williamson county. The rangers killed Sam Bass and one of his associates.

These instances are given to show that the operations of the rangers were not confined to the Rio Grande or any other frontier of Texas, but assisted the officers at any and all times and places in capturing criminals and in upholding the law. Through all those years, while eminent jurists like Richard Coke, O. M. Roberts, and John Ireland were in the gubernatorial seat, no question of the constitutionality of the organization was ever raised, but Legislature after Legislature made appropriations and provided for the maintenance and support of the rangers. They were used by the Governors to assist the civil authorities in upholding law and order, and wherever they were ordered they were received as guardians of peace and defenders of right and justice. Their fame spread not only over Texas, but over the entire Union. They devoted their time to suppressing high and heinous crimes, and no one dreamed of quartering them on unoffending communities to establish a system of espionage on its citizens and spend their time in arresting crap throwers, chicken fighters, and petty offenders against the Volstead or Dean laws. They were not ordered into communities to act independently of or antagonistically to the local officers, and to trample the Constitution underfoot by invading the privacy of homes without warrants, and assault and even kill unarmed citizens. The law of their creation is not responsible for these unlawful acts and were not contemplated, and such abuse of their power cannot be considered in passing upon the constitutionality of the law of the creation of the ranger force. It may be in great need of reorganization and realignment, but the system is not unconstitutional and should not be destroyed.

At no time was the ranger force under the ban of public opinion during the times of carpet bag rule in Texas, and no one sought to destroy the organization after Richard Coke was elected governor, but the force was reorganized and its great time of usefulness began at that period, in destroying feuds, in apprehending murderers, robbers, and thieves, and destroying lawlessness. The Davis state police, so odious to the white people of Texas, was a very different organization, and the hatred of the respectable men and women of the state was aroused by them and not by the rangers.

[6] There is no provision of the Constitution expressly denying to the Legislature the power and authority to create other agencies than those named in the Constitution for the preservation of law and the suppression of crime. There is nothing in the Constitution that by legitimate implication forbids other agencies than those named for upholding and enforcing law and preserving ' order and peace.

The Governor is empowered to call forth the militia to execute the laws of the state, to suppress insurrections, repel invasions, and protect the frontier from hostile incursions by Indians or other predatory bands; but it is not intimated that the laws shall be executed by the militia alone, but the plain inference is that the militia is to be used in executing the laws as against 'organized violation of laws, and the commission of crime. The power to use the militia in the execution of the law is given in section 7 of article 4 of the Constitution, while in section 10 of the same article it is prescribed that, the Governor "shall cause the laws to be faithfully executed," without reference to the agencies he is to use for that purpose. This is an imperative and positive command, more forceful than that he "shall take care that the laws be faithfully executed," which is found in the Constitution of 1845, art. 5, § 10. It needs the assistance of the ranger force, not to usurp the authority of county officers, but to assist them in the discharge of their duties, as did John B. Jones, D. W. Roberts, Neal Caldwell, N. O. Reynolds, J. B. Gillett, and their intrepid band of law enforcers.

[7] The duties of a sheriff are not defined in the Constitution of 1876, but it is provided that his ''duties, perquisites and fees of office shall be prescribed by the Legislature." Article 5, § 23. This provision is unlike that in the Constitution of 1845, which merely provided for sheriffs without authorizing the Legislature to fix their duties. The sheriff's duties under that Constitution could be ascertained from his duties under the common law. Under the present Constitution the sheriff's duties are defined by the Legislature, and that body would be authorized to provide for others to assist him in the performance of those duties and no constitutional question could possibly arise. The of-

fice of sheriff could not be abolished because the Constitution created the office, but created it without naming its duties and enjoined upon the Legislature to specify those duties. That body might make those duties light or arduous and might provide other agencies to assist in the performance of those duties. This is too plain for argument.

The act of 1874 clothed the officers of the rangers with all the powers of peace officers, but no one dreamed that this was a usurpation of the powers of the sheriff and unconstitutional. The act of 1876 (Acts 1876, c. 56) clothed the officers, noncommissioned officers, and privates with the powers of peace officers, and that was under the Constitution that set aside the carpet bag Constitution. The Legislature of 1876 did not suppose that it was re-enacting the infamous Davis Police Bill in giving rangers the authority of peace officers, nor that such provision was derogatory to any constitutional right of the sheriff or any one else. The act of 1879 was passed when one of the greatest of Texas jurists, O. M. Roberts, was Governor, and yet it met with his approval. The act of 1901 provided that the "officers, noncommissioned officers and privates of this force shall be clothed with all the powers of peace officers, and shall aid the regular civil authorities in the execution of the laws." All of these acts are practically the same in substance and effect. We are referred to the different captions of the acts to show that they are different in their statements of the objects of the law, but if there be any radical difference, which is not apparent, it would be a matter of no consequence, because no attack has been made on the caption of any of the acts, and it is not contended that the caption of the act of 1919 does not fully specify everything that is legislated on in the act. The laws as to the rangers have been practically the same ever since the Democratic Legislature of 1874 was chosen and passed the Ranger Act of that year.

It is made the distinct and imperative duty of the Governor to "cause the laws to be executed," and he has the authority to use all agencies given him by the Legislature to execute the laws, as long as those agencies are not in contravention of the provisions of the Constitution. The law under fire has been passed by Legislatures time and again and recognized by them, as well as the Governors and all officers of the constituted state government for more than a half century, and there is no foundation for the charge that the enactment of the law is an attempt upon the part of the Governor "to enlarge, solidify and confirm the power of the executive." Use of the ranger force, as made in years gone by, under the terms of the statute will not "enlarge, solidify and confirm the power of the executive." The law merely supplies an efficient agency to aid the Governor and county peace officers in the performance of their duties. The Constitution provides for the organization of a state militia and makes the Governor the commander in chief, but it nowhere intimates that the Governor must look to the militia alone for the preservation of peace and the enforcement of law, and nowhere limits the authority of the Legislature in providing means to enforce the laws. Appellee confuses the acts of the Governor in the use of a law with the constitutionality of the law. He says in his brief:

"From what source does the Governor get his authority? If he has no authority he acts without authority. If he acts without authority, where does the precedent point to? Logically to the Governor of Texas arising above the Constitution, and doing as he pleases and backing it up by a self-appointed police force—the substitution of a centralization for a republic. Are the people prepared to bow to the change? Will they agree to it? If so, what will become of their ballot boxes and liberties?"

No one will justify the unlawful acts of a Governor, whether with or without law; but that is not the question. The law being attacked is one that has been acted upon by many Governors, and they, if they have attempted to create "a centralized government for a republic," have made a miserable failure.

The law organizing the ranger force in no manner authorizes any interference with local self-government, nor interferes with the right of the people to elect sheriffs and justices of the peace, and constables and public weighers, as contended in the third point. The law of 1919 contemplates no interference by the rangers with the duly elected officers of a county, but provides that the rangers shall aid and assist the officers in upholding law and preserving peace and order.

[8] It seems to be a source of great complaint that the ranger law will authorize some one to invade the prerogatives of the sheriffs of Texas. It is a well-established rule that a court will not listen to an objection made to the constitutionality of an act by a party whose rights it does not affect and who has therefore no interest in defeating it. Cooley, Constitutional Limitations, p. 232. We have heard this case because it might in some way, not apparent, affect appellee as a taxpayer; but we can see no connection between his defense of the sheriff's prerogatives and the assault he is making on the act of 1919. The sheriff alone should complain if there is any grievance, which there is not.

[9] There is no merit whatever in the fourth point. The statute does not prohibit the ranger from taking the constitutional oath, if it were necessary, and the provision that he shall take an oath to perform his duties in accordance with law is not violative of the Constitution. If the part of the

act were invalid as to the oath it would not invalidate any other part of the act.

[10] The fifth point is farfetched and untenable. The act does not seek to lend the aid and credit of the state to the ranger force. It merely provides that the state will furnish the ranger with a carbine and pistol at cost, and deduct the price from his first salary.

[11] The sixth point is without merit. The law does not attempt to give the Governor another office by placing the ranger force under his command. He commands them as Governor and not in any other capacity.

[12] We conclude that the construction of the laws of the state as to the ranger force given by Governors, Comptrollers, Treasurers, and Legislatures for 50 years, should have great weight with courts in passing upon the constitutionality of an act, which construction must resolve any doubt as to the constitutionality of a law in favor of its validity. This theory would prevail even if there were matters in the Constitution from which it might be implied that the law was violative of the Constitution. While the rules stated could be invoked in sustaining the statute, it is not necessary to invoke them in this instance because in our opinion the law is constitutional, and infringes no provision of the Constitution express or implied. This court does not seek to extenuate or defend any criminal, tyrannous, or unlawful acts that have been committed by members or units of the ranger force, especially in the last two years, but condemns all such acts, as well as the acts of those in the background who have aided and abetted such violations of the law. No one who loves liberty and believes in the supremacy of law can sustain such assaults on our liberty. This, however, is not the question at issue and can have no legitimate bearing on the constitutionality of the law that creates and organizes the ranger force in Texas.

The judgment is reversed, the injunction set aside, and the cause dismissed.