# CASES

## ARGUED AND DETERMINED

### IN THE

# SUPREME COURT OF MINNESOTA

27   1
40  175
27   1
42  453

WESTERN RAILROAD COMPANY OF MINNESOTA vs. CHARLES A. DE GRAFF and others.

## July 12, 1880.

**Independence of Executive Department.**—No act done, or threatened to be done, by any member of the executive department of the state government, in his official but not in his individual capacity, can be brought under judicial control or interference by *mandamus* or injunction, whether such act proceeds from an error of judgment or misapprehension of official duty under the law.

**Same**—This rule applies both to ministerial acts and those which involve the exercise of judgment and discretion, and also to acts done in the performance of every official duty, whether it arises out of the constitution or a legislative enactment.

**Equity—Want of Jurisdiction as to Principal Defendant—Retention of Action as to other Defendants.**—A court of equity will not retain jurisdiction of an action as to some of the defendants, against whom the plaintiff has no cause of action, but is seeking auxiliary relief only, in aid of a demand claimed against another defendant, which constitutes the groundwork of the complaint, when, from want of jurisdiction over such other defendant, it is unable to make any adjudication as to such demand, or to grant any effectual relief in respect thereto.

1

Legislative Grant — Conditions—Sp. Laws 1877, c. 201, construed, and its
provisions *held* insufficient to authorize the plaintiff to maintain the pres-
ent action as against the respondents herein, upon the allegations of the
complaint.

By various acts of congress, an extensive land grant was
made to the territory and state of Minnesota to aid in the
construction of a line of railroad from Watab to Brainerd
and a line from St. Cloud to St. Vincent, the acts providing
that the lands so granted should be earned by construction
of such lines, and should be exclusively applied in the con-
struction of the lines for which they were granted, and should
be subject to the disposal of the legislature for that purpose
and for no other.   By various acts of the legislature of the
state and proceedings thereunder, those land grants became
vested in the St. Paul & Pacific Railroad Company, which
was required, both by the acts of congress and of the legisla-
ture, to complete each line within a time specified, under
penalty of forfeiture of the lands granted for such line.   That
company constructed a portion of the line from St. Cloud to
St. Vincent, (known as the St. Vincent Extension,) and a
very small portion of the line from Watab to Brainerd, (known
as the Brainerd Branch,) and in the fall of 1872 suspended the
work of construction, leaving a large amount due to various
contractors and subcontractors for work and material, most of
which had been furnished for the St. Vincent Extension.
The company not having resumed the work of construction,
and the time limited for completion of the lines having long
since elapsed, the legislature passed an act, approved March
1, 1877, entitled "An act to provide for the completion of the
lines of railroad, commonly known as the St. Paul & Pacific
Extension Lines."   Sp. Laws 1877, c. 201.   By this act the
rights, franchises, land grant, etc., of the St. Paul & Pacific
Railroad Co., appertaining to the Brainerd Branch, were
declared forfeited to the state, and regranted, "upon the terms
and conditions as in this act provided," to any company,
organized or to be organized, which should file with the

governor a written notice of its desire and intention, under and subject to the provisions of the act, to complete, maintain and operate such uncompleted line. After providing that any such company, acting under and pursuant to the provisions of the act, should become entitled to and invested with all the rights, franchises, land and property of the St. Paul & Pacific Company, appertaining to the forfeited line, "subject however to the exceptions, limitations, terms and conditions hereinafter mentioned," the act proceeded, in section 9, (which is quoted at length in the opinion,) to set apart one-half of all the lands up to 200,000 acres which should be first acquired on account of the construction of the Brainerd Branch, and one-half of all the lands up to 400,000 acres which should be first acquired on account of that part of the uncompleted St. Vincent Extension between Crookston and St. Vincent, to be reserved and retained by the state to be used by it for the payment of the claims incurred for work and material already furnished in the construction of such lines, statements of which had been filed in the state auditor's office in accordance with previous legislation. The same section further provided that the governor, attorney general and railroad commissioner should examine into the claims so filed, and adjust and ascertain the amount owing and unpaid to each claimant, and that when such amounts should have been ascertained, and any of the lands reserved should have been conveyed by the United States to the state, such lands, or so much thereof as might be necessary, should be sold by the governor at public auction, and the net proceeds of such sales be forthwith distributed ratably, by the governor, among the claimants.

The plaintiff, having caused an examination to be made of the claims filed with the state auditor, and having learned that the claims for work and material furnished for the Brainerd Branch did not exceed $30,000, (the remainder of the claims being for work and material for the St. Vincent Extension,) undertook the construction of the Brainerd Branch, and completed it in October, 1877, within the time prescribed by

the act of March 1, 1877, and thereby earned the lands granted to aid in its construction.

. For various reasons, (set forth in the complaint,) the grant for the Brainerd Branch fell far short of the full grant of ten sections per mile, and did not exceed 300,000 acres, which were worth less than the amount of the claims allowed by the commission.

In their statement of claims allowed, bearing date March 1, 1878, the commission allowed claims to the amount of $493,228.10, by far the largest claim being that of the defendants De Graff & Co., which was allowed at $462,559.52. Although requested to do so, the commission made no separation or distinction between the claims for work and material for the Brainerd Branch, and those for the St. Vincent Extension, though they were requested to make such separation, and could easily have done so.

At the time of the commencement of this action, (in November, 1878,) the St. Vincent Extension being still uncompleted, the governor was proceeding to select and sell certain portions of the lands earned by the construction of the Brainerd Branch by plaintiff, and was about (as stated in the complaint) to sell one-half of all the lands so earned, to satisfy the claims allowed by the commission. Whereupon the plaintiff brought this suit, in the district court for Crow Wing county, against De Graff & Co., and various others of the claimants, and against John S. Pillsbury, governor of the state. In the complaint it set forth at length and in detail the matters of which the foregoing statement is a summary, and also alleged that the claim of De Graff & Co., as allowed, was largely in excess of the sum actually due, and that the claims of the other defendants were not properly chargeable against either of the lines, and alleged a corrupt agreement between De Graff & Co. and the persons interested in the St. Vincent Extension, as a result of which section 8 of the act of 1877 was amended in 1878 by exempting that line from its provisions. The plaintiff, in its complaint, also offered to pay all sums justly and equi-

tably due any of the claimants mentioned in the act of 1877, for work and material furnished for the Brainerd Branch.

The relief demanded is (1) that the defendant claimants come to an accounting with the plaintiff as to what if anything is due them severally and respectively for work and material furnished for the Brainerd Branch, on claims filed with the auditor; (2) that the governor be enjoined preliminarily, and until plaintiff shall have paid into court or given satisfactory security to pay the sums found due on such accounting, and be thereafter perpetually enjoined, from selling any of such lands; and (3) that the amount due each claimant for work and material furnished for the Brainerd Branch be paid out of the money deposited in court, and that thereupon such defendants be adjudged to have no claim or lien on any of such lands.

The defendants De Graff & Co. and Morris demurred to the complaint, for want of jurisdiction in the court, and for failure of the complaint to state a cause of action. The demurrers were sustained by *Stearns*, J., and the plaintiff appealed.

*John B. Sanborn*, for appellant.

*Gilman & Clough*, for respondents.

CORNELL, J. Whether, under our constitution, any officer of the executive department of the state government can be subjected to judicial control and interference in the performance of an official duty, is a question which has been before this court in different forms and at different times for consideration and decision, and the holding has uniformly been against the existence of any such jurisdiction or power in the courts. *Matter of the Application of the Senate*, 10 Minn. 56 (78;) *Rice* v. *Austin*, 19 Minn. 104; *County Treasurer of Mille Lacs County* v. *Dike*, 20 Minn. 363; *St. Paul & Chicago Ry. Co.* v. *Brown*, 24 Minn. 517, 573, 574. The reasons for the holding are fully stated in *Rice* v. *Austin*, and *County Treasurer* v. *Dike*, *supra*, and need not be restated here. It rests upon the constitutional principle that each of these depart-

ments of government is entirely independent of the others, so that neither can be made amenable to any other for its action or judgment in discharging the duties imposed upon it, whatever their source or nature.

The principle applies to the performance of all official duties, whether imposed by the constitution, or by legislative enactment simply, or whether they are of a character strictly ministerial, or such as call for the exercise of discretion and judgment alone. It follows that every act done or attempted to be done by any officer of the executive department, in his official and not in his individual capacity, is shielded from all judicial interference or control, either by *mandamus* or injunction, even though such act may be founded in an error of judgment, or an entire misapprehension of official duty under the law. The acts complained of and sought to be enjoined in this action are clearly acts which the defendant Pillsbury is threatening to do in his official capacity as the governor of the state, and not as an individual. The court, therefore, as against him, can take no cognizance of this action, nor grant the preventive relief prayed for by the plaintiff. If the action is dismissed, as it must be as against this defendant, for want of any jurisdiction over the governor, whether it can still be maintained against the other defendants, who are the respondents herein, is the only question remaining for consideration and decision. To sustain it against them alone, it must appear that they have such an interest in the subject-matter of the action as makes them liable to the plaintiff in respect to the demand which constitutes the groundwork of the complaint. Story Eq. Pl. §§ 503, 513, 520, 731 and 734.

No cause of action is stated against the respondents alone. For its foundation, the action rests wholly upon the theory that, under a contract between the corporation plaintiff and the state, certain lands acquired by the latter, under a congressional grant in aid of the construction of a line of railroad from Watab to Brainerd, equitably belong to the plaintiff,

upon the payment of certain claims held by the respondents and others for partly building that line of road; and that the governor, acting in his official capacity for and on behalf of the state, is wrongfully and unlawfully about to sell and dispose of such lands in parcels, and to pass the legal title thereto, which is now vested in the state, to such parties as may become the purchasers, at public sale.  Such disposition and transfer of title, it is alleged, will greatly prejudice the. equitable right of the plaintiff to the lands, involve it in a multiplicity of suits, and cause irreparable loss and injury. Against this apprehended wrong this action is mainly directed, and the only cause of action stated is the alleged wrongful act of the governor by which it is threatened to be accomplished.  With this act respondents are in no way connected by any allegations in the complaint.  It is not pretended that they have, or claim to have, any title to, estate in, or possession of the lands; that the governor is acting in the matter under any authority derived from them, or that he is in any way subject to their control.  They are powerless either to compel, or to prevent him from doing the acts complained of, which, it is alleged, he is about to do.  They are, therefore, under no legal duty or liability to the plaintiff in respect thereto, and no action can be maintained against them on account of the same, or to enjoin their commission.

The accounting asked for by appellant in respect to that portion of the claims held by the respondents, which have been incurred in the construction of the Watab & Brainerd line of road, is sought solely in aid of the preventive relief of a perpetual injunction against the threatened sale and conveyance of the lands.  Its object is to ascertain and determine, by a judicial decision, the amount of that portion of such claims, to the end that the appellant, by paying the same, or depositing the amount thereof in court for that purpose, may become equitably entitled to a conveyance of the legal title from the state, and to a decree restraining the sale and a transfer of the title to other parties; and this is the only ground upon

which the right to an accounting is based. If such preventive relief cannot be had, because of want of jurisdiction over the only party against whom it can be enforced, it is evident that the auxiliary relief sought will be of no avail whatever, and cannot be made effectual for any purpose.

No judgment which the court can render in this action between the plaintiff and the respondents alone can affect the legal title to the lands in question as against the state, in which such title is vested, nor as against any of its grantees, for the reason that the state is not a party to the action; and the lands themselves cannot be affected by any such judgment, for the reason that the action itself is not a proceeding *in rem*, and the property has not been subjected to the jurisdiction of the court.

In any view, therefore, the litigation which is sought to be continued and carried on between the plaintiff and the respondents alone must necessarily prove fruitless and abortive, and this alone is sufficient cause why a court of equity ought to refuse to entertain it. It follows, from these views, that the decision of the court below was correct, both in its conclusion and the ground upon which it was placed.

Conceding, however, the correctness of appellant's position, that the court erred as to the question of jurisdiction, the order it made must nevertheless be sustained, for the reason that the complaint discloses no equity or cause of action entitling the plaintiff to the relief it asks against any of the defendants. Whatever legal or equitable rights appellant may have in the premises flow entirely from the legislative act of March 1, 1877, entitled "An act to provide for the completion of the lines of railroad commonly known as the St. Paul & Pacific extension lines." Sp. Laws 1877, c. 201. These lines comprised the then uncompleted lines of road from Watab to Brainerd, and from St. Cloud, *via* Crookston, to St. Vincent, in aid of each of which congress had made a grant of lands to the state. By the first section of this act, all the franchises and grants of land appertaining to the former of

these two lines of road were declared forfeited to the state; and it was one of the purposes of the act to regrant the same to whatever company might undertake the construction of the road, under and in pursuance of its provisions. The appellant company availed itself of the privileges of the act, and has completed the road from Watab to Brainerd; and the question now for consideration concerns the rights of the company in respect to the 100,000 acres of land which are in terms reserved to the state, out of the congressional grant applicable to that line of road, by section 9 of that act. The company, in accepting the provisions of the act, and the privileges and grants it conferred, took them expressly "subject to the exceptions, limitations, terms and conditions therein mentioned." (Section 7.) Whether, in disposing of the congressional land grant applicable to this line of road anew, the state, as against the United States, had any authority to prescribe these "exceptions, limitations, terms and conditions," or whether they were at variance with the purposes and terms of the grant from congress, are questions that need not be considered, as the appellant company is not in a position to raise any questions of that character. No one but the United States can complain that the conditions subsequent annexed to the grant to the state have not been complied with, or have been violated. *Baker* v. *Gee,* 1 Wall. 333. As against the appellant, the state, in turning over the grant to it, could rightfully impose whatever burdens or conditions, or make any reservations, it saw fit, and for any purposes satisfactory to the legislature.

Section 9 of the act enacts as follows:

"One-half of all the land up to 200,000 acres in quantity, which shall be first acquired on account of the construction of the present uncompleted line of railroad from Watab to Brainerd, or any part thereof, and one-half of all the lands up to 400,000 acres which shall be first acquired on account of the construction of the present uncompleted line of railroad from Crookston to St. Vincent, or any part thereof, by virtue

of any grant of lands which has been or which hereafter shall
be made to aid in the construction of said lines of railroad,
shall be reserved and retained by the state, to be used by it,
for the payment of the claims incurred for work and material
furnished in the construction of said lines of railroad, state-
ments of which claims were filed in the state auditor's office,
in pursuance of an act of the legislature approved February
21, 1874, entitled," etc.

"If any of the lands so reserved shall remain undisposed
of by the state after the payment of the claims of the said
claimants, such residue shall be conveyed by the governor to
the company which shall have completed the portions of rail-
road to which the lands comprising such residue shall apper-
tain.   The land so reserved shall be applied to the purposes
for which such reservation is made, in manner following:
The governor, attorney general and railroad commissioner, or
any two of them, shall, as soon as may conveniently be after
the passage of this act, examine into the claims, statements
of which have been filed in the state auditor's office, as here-
inbefore mentioned, and adjust and ascertain the amount re-
maining owing and unpaid to the parties respectively who have
filed such claims for work or materials, or for both, furnished
in the construction of said extension lines of railroad; and
they shall file in the state auditor's office a compiled state-
ment of the amounts so ascertained by them to be owing and
unpaid upon said claims, to the said parties respectively. In
ascertaining the amounts so owing to said claimants, the
said officers shall be empowered to examine witnesses under
oath; and the concurrence of any two of said officers shall
be sufficient for the determination of the amount remaining
owing on any such claim.   If it shall be made to appear to
said officers that the work or materials embraced in any such
claim were furnished by the claimant under a contract with
any other of said claimants, such fact shall be set forth in
such statement.

"Whenever, after the amounts remaining unpaid upon said

claims shall have been ascertained as herein provided, and any of the lands reserved as herein provided shall have been patented or otherwise conveyed by the United States to this state, such lands, or so much thereof as may be necessary for such purpose, shall be sold by the governor at public auction, and the net proceeds of all such sales be forthwith distributed ratably by the governor among said claimants, in proportion to the amounts found to remain due and owing upon their respective claims as herein provided; such notice of the time and place of such sale being first given as the governor shall consider best calculated to inform the public thereof. Such sales shall take place from time to time, as portions of the lands reserved as herein provided shall be patented or otherwise conveyed by the United States to the state, until the net proceeds of such sales shall have become sufficient to pay said claims in full, or until all such lands shall have been all sold."

The section also provides for a conveyance by the governor to the purchasers of the lands that may be so sold. It also directs how the reserved. lands shall be selected by the governor, and that the "selections shall be made from time to time, as the lands are acquired from the United States, until 300,-000 acres in all shall have been so selected and set apart."

The evident purpose of this section was to retain in the state the title and control of the lands thereby reserved, to be disposed of in the manner and for the purposes therein stated, until the objects of the reservation should be fully accomplished, and that then, and not before, the company building and completing either of said lines of road should be entitled to receive from the governor a conveyance of that portion of the "residue" thereof, pertaining to the line of road thus completed, which should remain undisposed of by the state at that time. The specific claims intended to be benefited by the provisions of the act are identified as those which were filed with the state auditor, under the act of February 21, 1874, and their nature and character are shown, not only

by that act, in which it is stated by whom and on what account they were incurred, but by that clause of the section under consideration which says that they were "incurred for work and material furnished in the construction of both said extension lines of railroad." That no distinction was intended to be made in respect to the adjustment or payment of the claims, or the funds out of which they were to be paid, is apparent from the provisions regulating the adjustment of the claims, the sale of the reserved lands, and the distribution of the net proceeds among the claimants. Only the aggregate amount owing and unpaid upon each claim is required to be found and specified in the "compiled statement" of claims, without any finding or statement as to how much of it accrued in the construction of either line of road. After this "compiled statement" is made and filed, the selections are to be made, and the sales proceeded with from time to time, as the granted lands pertaining to said lines of road are patented or certified to the state; and upon each sale of any of the reserved lands, the net proceeds realized therefrom are to be distributed ratably among all the claimants, according to the several amounts found to be owing them, as shown by said "compiled statement."

As, under the congressional grant, the state was entitled to have the granted lands pertaining to each ten-mile section of road patented or certified upon the completion of every such section, it is obvious that, in the enactment of this section 9 of the act now under consideration, the legislature must have fully contemplated the contingency that has since happened —that, in carrying out its provisions, all the lands which were reserved from the grant given by congress in aid of the Watab & Brainerd line of road might, by reason of the prior completion of that line, be required to be sold and applied towards the satisfaction of said claims, before any of the lands pertaining to the other line would be reached; and that, in such event, the first-named reservation might be subjected to more than a proportionate share of the burden of

satisfying such claims.   But the appellant company has no legal right to complain of this apparent hardship, for the reason that it voluntarily availed itself of the provisions of the act and its benefits, with full knowledge of all the burdens the happening of such a contingency might entail.

In respect to the amounts which were awarded to the several claimants by the commission which was created for that purpose by the act, the determinations of the officers composing the commission are final and conclusive.   It is not shown by any allegation that they have in any manner exceeded the authority delegated to them, and the act makes no provision for reviewing or correcting any errors of judgment they may have committed.

The suggestion that the questions submitted for their determination involve the exercise of judicial power, such as cannot, under the constitution, be conferred upon members of the executive department, is without any foundation whatever in fact.   In providing for the sale of the lands in question, and the distribution of the net proceeds among the claimants, the state was simply dealing with its own property, under the restraint of no contract obligations to either the claimants or the appellant company.   As to them, it could dispose of the proceeds in any manner and upon any principles it saw fit. It was within the sole discretion of its legislature to adopt any other mode of disposition and distribution than that contemplated by this act.   It might arbitrarily have designated in the act each claimant, and the particular amount which he should be entitled to receive out of the bounty from the state, and no one would have any legal right to complain. Instead of this, it has seen fit to submit the matter of the adjustment of such claims, under certain prescribed regulations, to officers of its own selection, and in whose judgment it has confidence; and it has declared that their determination in the matter shall form the basis upon which the bounty of the state shall be apportioned among the claimants; and if

it is satisfactory to the state, no one else can complain, as it affects the personal or property rights of nobody.

In view of these considerations, the court is of the opinion that, upon the allegations of the complaint, the appellant company has not shown itself entitled to any relief against the commission of the acts which, it is charged, the governor is about to commit, even though that officer can be and has been, in this case, properly subjected to the jurisdiction of the court. Nor can an accounting be required of the respondents herein in respect to their claims, for, if the views already expressed are correct, it is clear that, upon the facts stated in the complaint, no sufficient ground for an accounting exists.

Order affirmed.

GILFILLAN, C. J. I concur in the decision on the merits, but am not prepared to agree that, because the action will not lie against the governor, it may not be retained as against the other defendants.