# CASES

## ARGUED AND DETERMINED

## IN THE

# SUPREME COURT OF MINNESOTA.

STATE EX REL. J. A. A. BURNQUIST AND ANOTHER v. DISTRICT COURT SECOND JUDICIAL DISTRICT AND OTHERS.[1]

August 9, 1918.

No. 21,085.

**Injunction against executive officers — punishment for contempt.**

In an action to enjoin the several members of the Minnesota Public Safety Commission (created by chapter 261, Laws 1917), the village president and sheriff from enforcing the orders of the commission in closing a licensed saloon, the court, upon ex parte application, granted a temporary restraining order. The relator Burnquist, as Governor of the state, ordered the adjutant general, the relator Rhinow, to close the saloon with the military force of the state. The order was carried out; and relators were cited to show cause why they should not be punished for contempt. It is *held*:

(1) That the trial court is without jurisdiction to proceed against the relator Burnquist, since it appears that in closing the saloon he was in good faith discharging a constitutional duty, placed upon him as Governor, to take care that a duly enacted law was faithfully executed.

(2) That the same is true with reference to the relator Rhinow, since, as adjutant general, he was a proper agency in the hands of the Governor to aid in discharging his said duty.

Upon the relation of J. A. A. Burnquist and W. F. Rhinow, the supreme court granted its alternative writ of prohibition, directed to the district court for Ramsey county and the judges thereof, commanding

[1]Reported in 168 N. W. 634.

141 M.—1.

them to refrain from any further proceeding against relators in a proceeding for contempt in that court. The facts leading up to the proceeding in contempt are stated at the beginning of the opinion.

Order No. 17 of the Minnesota Public Safety Commission recited that the sale of intoxicating liquors, as it was being conducted in the village of Blooming Prairie, was interfering with the production of food and with the health and good habits of the soldiers of the national army and of the militia in the territory adjacent to the village, and that it was interfering with the efficiency of the application of the military, civil and industrial resources of the states of Minnesota and Iowa, towards the maintenance of the defense of said states and the nation, and to the successful prosecution of the war between the United States and Germany.

*Clifford L. Hilton,* Attorney General, *James E. Markham,* Assistant Attorney General, *William A. Lancaster,* and *David F. Simpson,* for relators.

In State v. Eberhart, 116 Minn. 313, 133 N. W. 857, 39 L.R.A.(N.S.) 788, Ann. Cas. 1913B, 785, the cases in this state are reviewed by this court, and the conclusion reached that the Governor, in the exercise of a purely ministerial function imposed by statute, is subject to the process of the courts. This conclusion is conceded to be opposed to the earlier cases in this state which were fully reviewed by the court. Probably no clearer or better definition of a ministerial duty can be found anywhere than in Mississippi v. Johnson, 4 Wall. (71 U. S.) 475, 18 L. ed. 437. In that case it was said: "A ministerial duty, the performance of which may, in proper cases, be required of the head of a department, by judicial process, is one in respect to which nothing is left to discretion. It is a simple, definite duty, arising under conditions admitted or proved to exist, and imposed by law." One of the simplest tests applied by the courts as to whether a duty is or is not a purely ministerial one is this: Can the performance of the particular duty be enforced by mandamus? If it cannot, then the courts are unanimous in the opinion that such duty is not a ministerial duty. If this test be applied to the case at bar, the answer is obvious. Suppose that after the safety commission had issued Orders 17 and 34 and the saloons in question had refused or failed to comply therewith, the Governor had taken no steps to enforce the

order of the commission, could he have been compelled by mandamus to close the saloons pursuant to the order? To merely state this proposition is, we think, to completely answer it.

When we turn to the act creating a Public Safety Commission (Laws 1917, c. 261), we do not find a single duty imposed upon the commission or upon any member thereof, or upon the Governor, which can be said to be purely ministerial, unless the duty of appointing such a commission by the Governor be so regarded. Section 3, which defines the powers of the commission, does not purport to set forth a single ministerial duty. The entire act may be searched with the utmost care and not a single definite duty can be found therein, the performance of which could be compelled by mandamus. Mississippi v. Johnson, 4 Wall. (71 U. S.) 475, 18 L. ed. 437. That case furnishes the only instance in the history of our nation—during a period of more than 140 years—where it has been sought through the courts to control or restrain the action of the President of the United States. We are unable to find that since that time has a single application ever been made to either mandamus or enjoin the President of the United States. The decision in that case was by a unanimous court and is reviewed in 6 Rose's Notes on U. S. Reports (Rev. ed.) pp. 88-92. We do not find that this case has since been qualified or criticised.

The constitutional powers and duties of a Governor of a state are in general similar to and co-extensive with those of the President of the United States. The form of government of the state is similar to that of the United States and consists of three separate, distinct, independent and equal departments of government. Const. art. 5, § 4.

In this case the commission made and promulgated Orders 17 and 34, the latter closing the plaintiff's saloon in the village of Blooming Prairie. If the order was valid, then clearly the Governor not only had the power but was charged with the duty of seeing that that order was complied with. In executing that order he is expressly authorized to call out the military forces to execute the laws. The statute does not prescribe other means for its enforcement. The whole controversy comes to this: Can the courts either compel the Governor to act or restrain his acting, with respect to his executive duties?

Not a single case in this court has ever held that the chief executive in any case, whether with respect to duties imposed by the Constitution or by statute, where such duties involve the exercise of judgment and discretion, may be controlled by the courts. The earlier cases squarely state the rule to be that he cannot be so controlled, and the only modification which has been made by the later cases is that, where the duty imposed by statute is a purely ministerial one, the performance of it may be compelled by the courts.

The Court of Appeals of New York (People v. Morton, 156 N. Y. 136, 50 N. E. 791, 41 L.R.A. 231, 66 Am. St. Rep. 547), has squarely held that mandamus will not lie against the Governor of the state to compel the performance of any act enjoined upon him. That court approves without reservation the decision of the supreme court of Michigan, in which the opinion was delivered by Judge Cooley, in the case of Sutherland v. Governor, 29 Mich. 320, 18 Am. Rep. 89. As was so aptly remarked in Marbury v. Madison, 1 Cranch (5 U. S.) 137, 2 L. ed. 60, it is not merely by the office of the person to whom the writ in a particular case is directed that jurisdiction or want of jurisdiction is determined—it is always the nature of the thing to be done.

In the case at bar, if Judge Dickson had ex parte or on hearing issued a restraining order or temporary injunction against the defendant Burnquist, as chief executive of the state, enjoining him, as such chief executive, from exercising his judgment and discretion with respect to the duties imposed upon him by the Constitution touching the enforcement of the commission's order or orders, there could be no question but that such an order would be void upon its face as beyond the jurisdiction of the court.

The Constitution has imposed the duty of executing the laws upon the Governor and has made him commander-in-chief of the military and naval forces of the state. This power expressly delegated to him by the Constitution is commensurate with his duties. What those duties may be, or, in a given case are, *the Governor himself must determine.* He has no power to inquire of this court with respect to his duties, and, if he did so inquire, this court would respectfully decline to advise him, as it has already done on several occasions. If he wishes legal advice he may secure it from the attorney general, but in any case, under any cir-

cumstances, what his action shall be must be determined by the Governor himself. It is his judgment and his discretion that is exercised, and for the exercise of that discretion he is responsible only to the people of the state who have elected him.

The favorite argument of those who oppose the absolute independence of the executive over the judicial department is that there can be no such thing as three independent and co-ordinate branches of government, and that clashes, unseemly if not dangerous, are bound to occur, and that there must be in the end some final authority to determine which department is right and which is wrong. All these arguments and all similar ones are fully answered by Judge Cooley in Sutherland v. Governor, 29 Mich. 220, 18 Am. Rep. 89. See also the reasoning of Mr. Justice Shiras in In re Waite (D. C.) 81 Fed. 359.

In Kendall v. U. S. 12 Pet. (37 U. S.) 524, 9 L. ed. 1181, it was held that the postmaster general was subject to be mandamused by the Federal courts with respect to the performance of a purely ministerial duty imposed upon him by an act of Congress. It was pointed out in that case that the office of postmaster general was not created by the Constitution but by act of Congress, and it was held that wherever the Congress creates an office by law, it may limit the powers of the office and in general may subject it to any supervision or control, executive or judicial, which the Congress in its wisdom may consider advisable. No question was therefore involved in that case with respect to the constitutional powers of either the executive or the judiciary. It was purely a question as to the construction of an act of Congress. Precisely the same may be said in regard to Marbury v. Madison, supra. The office of secretary of state is purely statutory and subject to absolute control by Congress.

In this state, while the executive department, under article 5 of the Constitution, consists of a Governor, lieutenant governor, secretary of state, auditor, treasurer and attorney general, the duties and powers of such executive officers, except as to Governor and lieutenant governor, are not defined by the Constitution. Section 4 of article 5 defines in general terms and in specific terms the powers and duties of the Governor. The lieutenant governor shall be ex officio president of the senate, and, in case of vacancy, shall be Governor during such vacancy. As to the secretary of state, treasurer, attorney general and auditor, not a single

duty is imposed upon them, nor a single power delegated to them by the Constitution. While, therefore, these officers are provided for by the Constitution, their powers and duties are prescribed by statute and by statute only. The same distinction, therefore, that has been made by the Supreme Court of the United States between proceedings against the President of the United States, even for the enforcement of a ministerial act, and that of proceeding against a statutory officer, such as members of the cabinet, applies equally to cases arising under the Constitution of the state of Minnesota.

It may confidently be asserted that the Supreme Court of the United States has never lent any support whatever to the proposition that the President of the United States could be questioned in any court by any sort of a proceeding for acts done by him by virtue of or under guise of his office. Kendall v. U. S. 12 Pet. (37 U. S.) 524, 9 L. ed. 1181; Mississippi v. Johnson, supra.

It has been uniformly held by this court and by other courts under a similar provision that legislative, executive and judicial departments created by Const. (Minn.) art. 3, are not only distinct but independent of each other, co-equal and co-ordinate. In the Matter of the Application of the Senate, 10 Minn. 56 (78) ; Rice v. Austin, 19 Minn. 74 (103).

The United States Circuit Court of Appeals, Eighth Circuit, has gone the full length of holding that the courts have no jurisdiction over the acts of a Governor, whether done and performed by him as Governor or as an ex officio member of a state board, and this, too, whether the act in question is an executive or governmental one or purely ministerial. Huidekoper v. Hadley, 177 Fed. 1, 100 C. C. A. 395, 40 L.R.A.(N.S.) 505.

The Eberhart case, supra, was decided by the court December 22, 1911. It was there held that certiorari would lie to review the Governor's action in removing a statutory officer.

On July 18, 1913, the supreme court of Michigan held precisely the opposite and to the effect that the courts of Michigan had no power under a constitution dividing the government into three departments to review by any direct proceeding against the Governor his action in removing a mayor for a cause under authority conferred by statute, although the proceeding for removal was to be construed as a quasi judicial one.

The opinion in that case reviews at considerable length the authorities bearing upon the subject and holds squarely to the doctrine laid down in the earlier case of Sutherland v. Governor, supra. The supreme court of Massachusetts also on January 9, 1911, in Rice v. Draper, 207 Mass. 577, 93 N. E. 821, 32 L.R.A.(N.S.) 355, held squarely to the doctrine of Sutherland v. Governor and refused to mandamus a Governor touching his official duties. See Ellingham v. Dye, 178 Ind. 336, 99 N. E. 1, Ann. Cas. 1915C, 200, and the reasoning and authorities cited in the dissenting opinion; Hartranft's Appeal, 85 Pa. St. 433, 27 Am. Rep. 667; Thompson v. German Valley R. Co. 22 N. J. Eq. 111; State v. Governor, 25 N. J. Law, 331; People v. Morton, 156 N. Y. 136, 50 N. E. 791, 41 L.R.A. 231, 66 Am. St. Rep. 547; Guthrie v. Hall. 1 Okla. 454, 34 Pac. 380.

In Cook v. Burnquist, 242 Fed. 321, Judge Booth held that the Public Safety Act authorized the commission to cut down the hours of saloons. Order 17, of which complaint is made here, cut down the hours and prohibited sales of liquor to be taken from the premises. The principle involved is the same in both cases. So far as there has been any judicial interpretation placed on the act, it is valid. Besides, it is presumptively valid. No law is presumed to be unconstitutional. All doubts are resolved in favor of its constitutionality. Because an interested party or his attorney asserts its invalidity is no reason why the Governor of the state should refuse to follow his own best judgment and discretion in respect to his official duties. If the Governor is wrong in his interpretation of the law and in his opinion as to what his duties require him to do, the injury complained of by Carroll is palpably not irreparable but is easily capable of measurement in dollars and cents.

The practical side of this controversy is an important one: (a) If on July 11, 1918, when Judge Dickson issued the order to show cause why the relators should not be punished for contempt, the district court of Ramsey county had lost jurisdiction over the action in question—the case having been transferred to Hennepin county—then this writ of prohibition should be made absolute. (b) Even if the lower court had jurisdiction over the action, still it was without power to issue an injunctional order against the Governor of the state, and the order being void, the court had no power to punish the Governor as for contempt in violat-

ing the same. (c) Even if the injunctional order was valid and binding upon the Governor, individually or as a member of the commission, still the court was without authority to punish him as for a contempt for anything done by him in his capacity as chief executive or commander-in-chief of the military forces.

If all the foregoing propositions, or any one of them, are correct, then the order to show cause in this case is void for want of jurisdiction, and further proceedings thereon should be restrained by a writ of prohibition made absolute. In Re Sawyer, 124 U. S. 200, 8 Sup. Ct. 482, 31 L. ed. 402.

*Ambrose Tighe,* for relators.

1. Contempt proceedings cannot be predicated upon disobedience of a void order. Powhatan C. & C. Co. v. Ritz, 60 W. Va. 395, 56 S. E. 257, 9 L.R.A.(N.S.) 1225; St. Louis, K. & S. R. Co. v. Wear, 135 Mo. 230, 36 S. W. 357, 658, 33 L.R.A. 341.

2. The restraining order is void: (a) Because it was issued before the action was commenced; (b) the order in question was not a restraining order but a mandatory injunction, and as such was not within the power of the court to grant without notice. Northern Pac. R. Co. v. City of Spokane (C. C.) 52 Fed. 428; (c) the restraining order forbade public officers from instituting criminal prosecutions. A public officer cannot be restrained from so doing even under an unconstitutional statute.

3. The Ramsey county court had no jurisdiction to issue the order of July 11, 1918, requiring the relators to show cause why they should not be punished for contempt, because the case had, on July 2, 1918, been transferred to Hennepin county and was thereafter there pending. That order was issued in the case of Carroll v. Burnquist et al., described as pending in Ramsey county. No such action was pending in Ramsey county on July 11, 1918, and therefore the Ramsey county court was without power to issue any order in the action. Which court has jurisdiction of a contempt proceeding in the event of a transfer of an action, the court which originally issued the order disobeyed, or the court to which the action has been transferred?

Contempt proceedings are either criminal (G. S. 1913, § 8582), or civil (G. S. 1913, § 8354), in character. It is not always easy under the

definitions to determine of which sort any specific proceedings are. The subject was under consideration in Red River P. G. Assn. v. Bernardy, 128 Minn. 153, 150 N. W. 383. The test laid down in some of the cases is this: If the essential purpose is to punish the offender, the proceedings are criminal. If their essential purpose is to coerce obedience for the personal benefit of the aggrieved litigant, the proceedings are civil.

But in order that there may be even a pretense that the Ramsey county court is other than a meddler here, it will be necessary to classify the proceedings here involved as civil. If they are criminal, inasmuch as the disobedience complained of occurred in Steele county, the Steele county court would alone have jurisdiction to punish the crime under the Constitution, article 1, § 6. (a) Being civil in their nature, it is submitted on the basis of reason alone, and apart from the authorities, that it would be altogether impracticable for the original court to retain jurisdiction for the purpose of punishing disobedience of its order, when it no longer had jurisdiction of the other aspects of the action in which the order was issued. (b) But the authorities leave no doubt on the question. Some of them have had the specific problem before them. Hawkins v. State, 125 Ind. 570, 25 N. E. 818; State v. District Court, 34 Mont. 258, 86 Pac. 798; Cartwright's Case, 114 Mass. 230; In re Fil Ki, 80 Cal. 201, 22 Pac. 146; Wright v. Suydam, 79 Wash. 550, 140 Pac. 578; Wells v. Wells, 46 Okla. 88, 148 Pac. 723.

*P. J. McLaughlin* and *F. M. Catlin,* for respondents.

The trial court properly granted the preliminary restraining order. It had jurisdiction to try and determine the issues presented, and the writ of prohibition was not the proper remedy. The complaint states a cause of action against public officers who, under the guise of a grant of ministerial powers, acting ultra vires, caused irreparable injury to plaintiff, for which he had no adequate remedy at law. State v. Ward, 70 Minn. 58, 72 N. W. 825; State v. Crosby, 92 Minn. 176, 99 N. W. 636; State v. Young, 44 Minn. 76, 46 N. W. 204; State v. Cory, 35 Minn. 178, 28 N. W. 217; State v. Municipal Court of City of St. Paul, 26 Minn. 162, 2 N. W. 166; State v. District Court for Ramsey County, 26 Minn. 233, 2 N. W. 698; State v. District Court of Watonwan County, 77 Minn. 405, 80 N. W. 355.

The acts of the relators were subject to the control of the courts. The Governor was not in the discharge of any executive duty involving the exercise of his discretion when he caused the military forces of the state to trespass upon the plaintiff's premises, and by force and arms to take possession thereof, to forcibly eject the plaintiff and his customers therefrom, and in keeping the plaintiff's customers from entering his premises, and in preventing the plaintiff from transacting his ordinary business in a proper and lawful manner, but, on the contrary, he was acting in direct violation of the Constitution and laws of the state. Section 14 of the Bill of Rights provides that the military shall be subject to civil powers. Section 4, art. 5; G. S. 1913, § 2359. The Governor, as chairman of the Safety Commission, may be enjoined. Chamberlain v. Sibley, 4 Minn. 228 (309); Ex parte Young, 209 U. S. 123, 28 Sup. Ct. 441, 13 L.R.A.(N.S.) 932, 14 Ann. Cas. 764, 52 L. ed. 714, at page 728; 22 Cyc. 879-881; Board of Liquidation v. McComb, 92 U. S. 531, 23 L. ed. 623; Louisville & N. R. Co. v. Burr, 63 Fla. 491, 58 South. 543, 44 L.R.A.(N.S.) 189. The relator Burnquist, in his petition for the writ of prohibition, states that in using the military as he did he was enforcing obedience to the order of the commission closing the saloons and prohibiting the sale of intoxicating liquor therein or therefrom. This clearly relates to Order No. 34. And if Order No. 34 is void, then the Governor could exercise no discretionary power to enforce a law which did not exist, and he is liable for his acts as any other individual. Hatfield v. Graham, 73 W. Va. 759, 81 S. E. 533, L.R.A. 1915A, 175, at 181, Ann. Cas. 1917C, 1; McConaughy v. Secretary of State, 106 Minn. 392-415, 119 N. W. 408; Cooke v. Iverson, 108 Minn. 388, at page 390, 122 N. W. 251.

There can be no discretionary power to enforce a law which does not exist. Ex parte Young, supra. Clearly, the Governor, acting as chairman of the Safety Commission, was performing an act that did not necessarily pertain to the duties of the executive of the state, and it might be performed as well by one officer as another. Under the authorities cited, the Governor, as chairman of the Safety Commission, could be enjoined. And it further appears that where, as in this case, the Governor was undertaking to enforce a void order, one which the commission had no power to grant, the matter of discretion in enforcing it did not arise, because "rights cannot be built up under it, and if an executive officer

attempts to enforce it, his act is his individual act and not his official act, and he is subject to the control of the courts as would be a private individual." Ekern v. McGovern, 154 Wis. 157, 142 N. W. 595, 607, 612, 46 L.R.A.(N.S.) 796.

Whether a change of venue is caused by the mere filing of affidavits and demand therefor, jurisdiction remained in the district court of Ramsey county to hear and determine the question as to whether the relators were guilty of the contempt charged. We do not concede, but on the contrary deny, that the venue has been changed. We contend that the statute relating to a change of venue in that manner is not applicable to a suit brought, as this was, against public officers. However that may be, the contempt in this case is a criminal contempt. It is a proceeding where the state is on one side and the relators herein on the other. And while it arises out of the action, it is independent, although, in a measure, collateral to the main action. If the venue were changed by the filing of the affidavits and demand, and the change drew with it the contempt proceedings then pending, it is difficult to see how the district court of Hennepin county could proceed to hear or determine the question of contempt. Jurisdiction to try and determine the question of contempt remained in the district court of Ramsey county. 13 C. J. 56, §§ 80, 81, and cases cited; High, Injunction (4th ed.) § 1431; Gompers v. Buck Stove & Range Co. 221 U. S. 418, 31 Sup. Ct. 492, 55 L. ed. 797, 34 L.R.A.(N.S.) 874, 887.

We submit that it is a question of fact for the trial court to determine in the contempt proceedings whether the relator Burnquist, in doing what he did, acted as Governor and commander-in-chief or as chairman of the Safety Commission; that the orders set forth in the complaint and herein are void and unenforceable; that the writ of prohibition is not the proper remedy; that the petition for the writ is insufficient; that there was no excuse or justification for the employment of the military in the enforcement of the so-called Order No. 34; that the trial court had jurisdiction of the action, and that in granting the restraining order it did not exceed its jurisdiction; that if the relator Burnquist intended to claim immunity for his acts, he should have made such claim known to the trial court in the contempt proceeding; that the writ should be quashed.

HOLT, J.

The district court of Ramsey county was ordered by this court to show cause why a writ of prohibition should not issue directing said district court and the several judges thereof to refrain from proceeding as for contempt against the relators, the Governor and the adjutant general of this state. The respondent, the Honorable Frederick N. Dickson, makes a return in his own behalf, and in behalf of the court and the other judges thereof, except the Honorable Hascal R. Brill who returns that he is disqualified from sitting in the case.

From the petition and the return of respondent Dickson the following may be stated as the material and relevant facts:

In December, 1917, and ever since William R. Carroll has had a license to vend intoxicating liquors at Blooming Prairie, a village of some 850 inhabitants in Steele county, Minnesota. It is located about 25 miles south of Owatonna, and nearly the same distance from the southern boundary of the state. No intoxicating beverages can be procured lawfully in the counties to the east, south or west of Steele county, nor in Iowa, nor in Steele county except in Owatonna and Blooming Prairie. The business of Mr. Carroll was therefore exceedingly lucrative, although the license fee in the village was $1,500 and three other licensed saloons were doing business there, until the Minnesota Commission of Public Safety, on December 5, 1917, by Order No. 17, directed the licensed liquor dealers at Blooming Prairie to refrain from dispensing liquors except at retail, to be consumed on the premises where dispensed, and only between the hours of 9 a. m. and 5 p. m. on week days. It appears that this order resulted after the commission, in the fall of 1917, had caused an investigation to be made as to the effect of the liquor traffic upon the military, civil and industrial resources of the state, and the peace and public safety of the inhabitants, and particularly the effect of the sale of intoxicating liquor in places located in the midst of large areas of "dry" territory. The liquor dealers of the village complied with the order until in June, 1918, when Carroll and two others began to dispense their goods in open defiance thereof. The commission then issued Order No. 34, directing the president of the village to forthwith close and keep closed the places of business of the offending dealers. This last order was enforced through the sheriff of Steele county.

In that situation Carroll commenced an action against the members of the commission, the president of the village, and the sheriff of the county, to permanently enjoin them from closing or interfering with his business.   On ex parte application, the respondent Dickson issued a temporary restraining order June 29, 1918, requiring the defendants in the action to refrain from closing or keeping closed Carroll's place of business, and from interfering therewith, and from instituting any proceeding to enforce the orders of the commission until further order of the court.   Upon being informed of the restraining order, the sheriff, who had kept the saloons closed, withdrew; and Carroll resumed business. Thereupon and on July first, relator Rhinow, the adjutant general of the state, in obedience to the order of the Governor, the relator Burnquist, with the aid of the military force of the state, closed Carroll's saloon business.   Carroll then obtained from Judge Dickson an order citing relators to answer for contempt, and they immediately procured this order to show cause why a writ of prohibition should not issue.

The Minnesota Public Safety Commission, created by chapter 361, p. 373, Laws 1917, consists of seven members; the Governor and attorney general being ex officio members, the other five being appointed by the Governor and removable at will by him.   Extensive discretionary powers are given the commission, and an appropriation of one million dollars is made to be expended as the commission deems fit in the performance of its duty.   The purpose of the law is therein declared thus:

"In the event of war existing between the United States and any foreign nation, such commission shall have power to do all acts and things non-inconsistent with the Constitution or laws of the state of Minnesota or of the United States, which are necessary or proper for the public safety and for the protection of life and public property or private property of a character as in the judgment of the commission requires protection, and shall do and perform all acts and things necessary or proper so that the military, civil and industrial resources of the state may be most efficiently applied toward maintenance of the defense of the state and nation and the successful prosecution of such war, and to that end it shall have all necessary power not herein specifically enumerated, and in addition thereto the following specific powers."   (First part of sec-

tion 3.)   Among the specific powers conferred are those contained in subdivision 3 of section 3 :

"Said commission shall have power and it shall be the duty of said commission to co-operate with the military and other officers and agents of the United States government in all matters pertaining to the duties and functions of such commission and shall aid the government of the United States in the prosecution of any such war and in relation to public safety so far as possible."

In the view we take of the matter for decision many propositions, exhaustively briefed and ably presented in the oral arguments, will not be reached.   For instance, we are importuned to determine and define the powers of the commission to make the orders mentioned, and every question relating to its powers and what limitations, if any, there be; also, whether the Governor may be controlled by injunction or otherwise, the same as any other member of the commission.   But we think it would be improper for this court to pass upon these matters in advance of a determination by the court below, for the issuing of the temporary restraining order, upon an ex parte application, cannot be considered an adjudication upon the validity of the orders of the commission, nor a determination upon the extent or limitation of the powers of that body, nor even upon the extent to which the Governor in respect to official duties may be controlled by the court.   Furthermore, relators do not plant their right to the writ upon the validity of the orders referred to, nor even upon that of the law creating the commission; but insist that, even though the orders be void and the law unconstitutional, the Governor acted within the scope of his constitutional powers, and cannot be proceeded against as for contempt.   We have therefore not been favored with the arguments that might well be advanced in support of the legality of Orders 17 and 34, and it would be manifestly inappropriate for us to consider their legal status; unless clearly made necessary to a decision upon the application for a writ.   The same is more patently true with reference to defining the powers and limitations of the commission.

We reach the conclusion that if it clearly appears that the acts, for the doing of which the Governor is cited for punishment by the respon-

dent, were done in discharge of official duties requiring the exercise of judgment and discretion and imposed upon him as chief executive by the Constitution, he is not amenable to punishment. In that event the respondent is without jurisdiction to entertain the contempt proceedings, and the writ of prohibition should issue.

The early decisions of this court, in harmony with the weight of authority, are to the effect that the judicial department will not by mandamus or injunction coerce, direct or control the executive state officers. Rice v. Austin, 19 Minn. 74 (103) 18 Am. Rep. 330; State v. Dike, 20 Minn. 314 (363); St. Paul & Chicago Ry. Co. v. Brown, 24 Minn. 517; Western R. Co. v. DeGraff, 27 Minn. 1, 6 N. W. 341; State v. Whitcomb, 28 Minn. 50, 8 N. W. 902; State v. Braden, 40 Minn. 174, 41 N. W. 817, wherein the exception suggested in Chamberlain v. Sibley, 4 Minn. 228 (309) was disapproved. But the later cases of Hayne v. Metropolitan Trust Co. 67 Minn. 245, 69 N. W. 916; Cooke v. Iverson, 108 Minn. 388, 122 N. W. 251, 52 L.R.A.(N.S.) 415; and State v. Eberhart, 116 Minn. 313, 133 N. W. 857, 39 L.R.A.(N.S.) 788, Ann. Cas. 1913B, 785, modify somewhat the earlier statement of the law; the Hayne case holding that when private property, to which the state has no claim, is held in trust by a state officer, the court can compel him to turn it over to the proper party; the Cooke case ruling that "Where duties purely ministerial in character are conferred upon the chief executive or any member of the executive department, as defined by our Constitution, and he refuses to act, or where he assumes to act in violation of the Constitution and laws of the state, he may be compelled to act or restrained from acting;" the Eberhart case holding, on certiorari to review the action of the Governor in removing an official, that, where a statute invests the Governor with a special quasi judicial duty, his performance thereof is subject to review by the court.

Each of these cases recognizes to the full the rule that courts cannot by any process control or direct a head of the executive department of the state in the discharge of any constitutional executive duty involving the exercise of judgment and discretion. No judicial opinion to the contrary has been noticed. Cases need not be here cited, but a number may be found by consulting the references in 12 R.C.L. § 10, p. 1008, and the notes to State v. Brooks, 6 L.R.A.(N.S.) 750, and Rice v. Draper, 32 L.R.A.(N.S.) 355. The authorities seem to agree that

under constitutions, similar to that of this state, where all power and authority of government are vested in three distinct, co-ordinate and independent departments—the legislative, the executive and the judicial —the judicial has not the power to control, coerce or restrain the action of the other two within the sphere allotted them by the Constitution wherein to exercise judgment and discretion. It would be unthinkable that the courts of this state should attempt to enjoin the legislature from enacting or the Governor from approving a statute, no matter how glaringly unconstitutional it might appear or how highly injurious its mere enactment might be to private interests. And it would seem just as unthinkable that the chief executive of the state should be coerced either into enforcing a statute which the courts might deem he should enforce, or be subjected to punishment for enforcing one the constitutionality of which a court may doubt, but has not passed final judgment upon. Where, in a proper action or proceeding, a statute or an order of an executive or administrative commission has been finally adjudged unconstitutional or void, we entertain no doubt that the Governor of the state will recognize such decision as binding upon him, and the courts will have no occasion to ever consider the question of contempt relative to the Governor's actions with reference thereto. But if, in advance of such adjudication, he may not be coerced into enforcing or not enforcing, it follows that he cannot be punished for proceeding in the manner his judgment may dictate. However, we are not to be understood to hold, or to intimate, that if the Governor should attempt in good faith to execute a statute adjudged invalid by a trial court he could be subjected to punishment as for contempt.

Section 4, art. 5, of the state Constitution makes the Governor commander-in-chief of the military forces and provides that he may call out such forces to execute the laws, and enjoins upon him the duty to "take care that the laws be faithfully executed." To relator Burnquist as Governor, chapter 261, p. 373, Laws 1917, appeared a duly enacted law; the commission therein created, by orders duly adopted and promulgated, was attempting to perform the work demanded of it by the act. It was the Governor's constitutional duty to take care that this law was faithfully executed in the manner contemplated by the legislature. To enforce these orders of the commission the Governor did

the act for the doing of which the respondent now threatens to punish him. It seems clear to us that when the liquor dealers of Blooming Prairie disobeyed the orders of the commission, the Governor was confronted with the proposition whether or not the execution of chapter 261 was being defied, and, if he reached the conclusion that it was, the Constitution required him to exercise his judgment in upholding and enforcing that law by the means at his command.

But it is contended that the law may be invalid and the orders of the commission for that, or for other reasons, void. The Governor is justified in acting on the presumption that the statute is legally efficient and the orders of the commission, created by such statute and given large powers, are valid. And neither this law nor the orders referred to have up to the present time been adjudged invalid by any court upon a hearing had, but rather the contrary appears. See Judge Booth's opinion in Cook v. Burnquist, 242 Fed. 321.

The position of the President under the Federal Constitution in respect to his duty to execute the laws of Congress is precisely that of the Governor under our state Constitution in respect to the laws enacted by our legislature. The same similarity exists with reference to the three distinct departments of government, and the limits wherein the one is free to act without interference from the other. In Mississippi v. Johnson, 4 Wall. (71 U. S.) 475, 18 L. ed. 437, an unsuccessful attempt was made to enjoin the President from enforcing a law alleged to be unconstitutional and void, the court saying [p. 500]:

"It will hardly be contended that Congress [courts?] can interpose, in any case, to restrain the enactment of an unconstitutional law; and yet how can the right to judicial interposition to prevent such an enactment, when the purpose is evident and the execution of that purpose certain, be distinguished, in principle, from the right to such interposition against the execution of such law by the President? The Congress is the legislative department of the government; the President is the executive department. Neither can be restrained in its action by the judicial department; though the acts of both, when performed, are, in proper cases, subject to its cognizance. The impropriety of such interference will be clearly seen upon consideration of its possible consequences. Suppose the bill filed and the injunction prayed for allowed.

141 M.—2.

If the President refuse obedience, it is needless to observe that the court is without power to enforce its process. If, on the other hand, the President complies with the order of the court and refuses to execute the acts of Congress, is it not clear that a collision may occur between the executive and legislative departments of the government? May not the House of Representatives impeach the President for such refusal? And in that case could this court interfere, in behalf of the President, thus endangered by compliance with its mandate, and restrain by injunction the Senate of the United States from sitting as a court of impeachment? Would the strange spectacle be offered to the public world of an attempt by this court to arrest proceedings in that court? These questions answer themselves."

But we need not go to the full extent of the reasoning in the Johnson case, nor determine the jurisdictional power of the trial court to issue the restraining order which the Governor is charged with violating, although it is not amiss to observe that Carroll's action is against the individuals composing the Public Safety Commission and not against the Governor as such. It has now come to the point where, as suggested in the case quoted from, there is an attempt to assume the power and jurisdiction that may lead to punishing the Governor for acts done in the discharge of an executive and political duty placed upon him by the Constitution. Ever since the time Chief Justice Marshall, in the Burr trial, had directed a subpoena duces tecum to be served upon the President, his observation has been accepted as sound law that, if the President should disobey the process because in his opinion the document called for should not for political or governmental reasons be exhibited, that official could not be punished for contempt. Thompson v. German Valley R. Co. 22 N. J. Eq. 111; Appeal of Hartranft, 85 Pa. St. 433, 27 Am. Rep. 667. And no court, so far as we have been advised, has held or intimated that the chief executive of the state or nation could be made amenable to contempt proceedings for performing the duty, imposed by the Constitution, to execute a duly enacted law. The able dissenting opinion of Chief Justice Agnew in the appeal of Hartranft, supra, acknowledges this to be the law. We also conclude that Justice Marshall in Ekern v. McGovern, 154 Wis. 157, 142 N. W. 595, 46 L.R.A. (N.S.) 796, where he takes occasion, in his forceful and eloquent way, to

vindicate the power of the court over the executive if the latter acts contrary to law, accepts the rule above stated, for he approves the case of People v. Morton, 156 N. Y. 136, 50 N. E. 791, 41 L.R.A. 231, 66 Am. St. 547. A moment's reflection will make clear that a contrary rule might seriously interfere with the performance of the duties required of the chief executive. Legislative enactments frequently affect private interests injuriously. These laws may be constitutionally questionable or plainly invalid. If every individual affected may, in actions. challenging their validity, ex parte obtain temporary restraining orders against their enforcement, and the Governor should nevertheless deem it his duty to enforce the law, he could be subjected to contempt proceedings in the different courts where, peradventure, such restraining orders issued, the people might be wholly deprived of the services of the chief executive, or else his time so frittered away in court proceedings that none would be left for the discharge of his official duties, to say nothing of the unseemly clash between two departments of the government.

We cannot accept the contention made that relator's act, in closing the offending Blooming Prairie saloon, should be regarded as having been performed either as a member of the commission or, if the orders of the commission be for any reason void, as a private individual. It is plain to us that whatever relator Burnquist did in closing the saloons was in the capacity of Governor, and in the endeavor to perform the duties imposed upon him as such by the Constitution and the laws; and the character of these acts, insofar as the attempt to punish him for contempt reaches, does not change because of the possible invalidity of the law or of the orders of the commission promulgated under that law. It may well be that a different legal aspect of them should be taken by the court when determining their effect upon private interests; but with that we are not now concerned.

A few words should be said regarding Cooke v. Iverson, supra, and Ex Parte Young, 209 U. S. 123, 28 Sup. Ct. 441, 52 L. ed. 714, 13 L.R.A. (N.S.) 932, 14 Ann. Cas. 764, upon authority of which it is claimed that the writ prayed for should not issue. In the former it is said: "If a member of the executive department of the state is subject to the control of the judiciary in the discharge of purely ministerial duties, it logically follows

that he is subject to such direction if he is threatening to execute an unconstitutional statute, to the irreparable injury of a party in his person or property. Rippe v. Becker, 56 Minn. 100, 57 N. W. 331, 22 L.R.A. 857. If a statute be unconstitutional it is as if it never had been. Rights cannot be built up under it, and, if an executive officer attempts to enforce it, his act is his individual and not his official act, and he is subject to the control of the courts as would be a private individual," citing Cooley, Const. Lim. 250 (7th Ed. p. 259) and the Young case. The connection in which Chief Justice Start employed the language must be kept in view. The case involved a purely ministerial act imposed by statute upon the state auditor; and, although the claim to injunctive relief was based upon the alleged unconstitutionality of a statute, it did not involve punishing for contempt for enforcing an unconstitutional statute in advance of its being so adjudged, nor did it relate to a duty imposed by the Constitution. And, as to Ex parte Young, it is clear that the question before the court was not similar to the one before us; for the Federal court, in enforcing a violated restraining order against an executive state officer, is not hampered by any constitutional inhibition against interference with a co-ordinate department of government. This is well stated in Bates v. Taylor, 87 Tenn. 319, 11 S. W. 266, 3 L.R.A. 316.

Since the actual closing of Carroll's saloon was accomplished by the adjutant general with the military power of the state, and that power, by section 14, article 1, of the Constitution, is subject to the civil power, the suggestion may be made that relator Rhinow can be proceeded against. We think not. Rhinow was in duty bound to carry out the order of the Governor, his commander-in-chief. And having concluded that the Governor cannot be punished under contempt proceedings for what he caused to be done, it would seem to be a reasonable deduction that the agency which the law placed in his hands for accomplishing that act should likewise be immune. Otherwise the Governor might be indirectly coerced by the courts in matters pertaining to his constitutional duties.

In taking leave of the case we wish to make clear that we have not passed upon the merits of the action instituted by Carroll, nor upon the validity of the orders of the commission therein mentioned, nor upon the propriety of issuing a restraining order therein upon ex parte

application. Our decision reaches no further than this: That, in attempting to enforce a law and the orders of a commission created by and acting under that law, the relator Burnquist was performing his constitutional duties as Governor, and when so doing he is not amenable to the judisdiction of the courts in a proceeding as for contempt.

Let the writ of prohibition issue as prayed. ·